IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHNATHON MOHR,<br>for himself and others similarly situated,<br><br>           Plaintiff,<br><br>   v.<br><br><br><br>THE TRUSTEES OF THE UNIVERSITY<br>OF PENNSYLVANIA,<br><br>           Defendant. | )<br>)<br>)<br>)<br>)  C.A. No. _____<br>)<br>)<br>)  (Removal from: The Court of Common Pleas of<br>)   Philadelphia County, Case No. 230102149)<br>)<br>)<br>)<br>)<br>)<br>) |

## NOTICE OF REMOVAL

TO THE CLERK OF THE COURT

Pursuant to 28 U.S.C. §§ 1441, 1442, and 1446, the Trustees of the University of Pennsylvania, as owner and operator of the Hospital of the University of Pennsylvania ("HUP" as part of "Penn Medicine") hereby removes this action, <u>Mohr v. The Trustees of the University of Pennsylvania</u>, Case No. 230102149, originally filed in the Court of Common Pleas of Philadelphia County, where it is now pending, to the United States District Court for the Eastern District of Pennsylvania.

**NATURE OF REMOVED ACTION**

1. On January 23, 2023, Plaintiff filed suit in the Court of Common Pleas of Philadelphia County. A copy of all documents on file are collectively attached as **Exhibit 1**.

2. HUP was served with the Class Action Complaint ("Complaint") on January 26, 2023 by personal service. See attached as **Exhibit 2.**

Case 2:23-cv-00731   Document 1   Filed 02/24/23   Page 2 of 16

3. Penn Medicine owns and operates the following websites: pennmedicine.org; pennbehavioralhealth.org;[1] and/or uphs.upenn.edu[2] ("the Websites") as well as the myPennMedicine app ("the App").

4. The Complaint alleges that that HUP "aids[sic] employs, agrees, and conspires with Facebook/Meta to intercept communications sent and received by Plaintiff and Class Members". *Complaint*, ¶ 2. HUP denies any wrongdoing. The Complaint subsequently identifies this third party as "Facebook," while noting that, "In October 2021, Facebook, Inc. changed its name to Meta, Inc." *Complaint*, ¶ 2, n.1. This Notice will follow Plaintiff's convention and simply call the third party Facebook.

5. The Complaint alleges that by using Facebook pixels and cookies in connection with the Websites and the App, HUP caused disclosures to Facebook that violated the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. § 5701, *et seq*. ("Pennsylvania Wiretapping Act"). *Complaint*, ¶¶ 2 and 12. HUP denies any wrongdoing.

6. The Complaint seeks eleven forms of relief against HUP, including declaratory relief, compensatory damages, statutory damages, punitive damages, disgorgement, prejudgment interest, attorney's fees, expenses of cost and suit, and injunctive relief. *Complaint*, pp. 22-23, **Prayer for Relief**.

7. In this action, Plaintiff has commenced a suit in State court against a person (HUP) acting under United States agencies (the United States Department of Health and Human Services or "DHHS," and the Centers for Medicare & Medicaid Services or "CMS"), which in turn were acting under color of office. Therefore, this action can be removed under 28 U.S.C. § 1442(a)(1).

---

[1] Pennbehavioralhealth.org redirects to www.med.upenn.edu/PennMedicineEAP/, which is Penn Medicine EAP (formerly known as Penn Medicine Princeton EAP and Penn Behavioral Health Corporate Services). This is an employee assistance program.
[2] uphs.upenn.edu redirects to pennmedicine.org.

8. As set forth in additional detail below, DHHS and CMS have a long-standing policy of promoting wider availability of Electronic Health Records ("EHR"), such as those made available by Penn Medicine at mypennmedicine.org ("Patient Portal").

9. Since the federal government does not itself hold such EHRs, it requires the assistance of eligible providers to achieve its objectives of (a) creating patient portals and (b) providing patients instructions on how to access their health information.

10. The federal government has incentivized eligible providers, like HUP, to assist in meeting its objectives by (previously) making incentive payments for meeting benchmarks and (more recently) by threatening to reduce payments for failing to meet benchmarks.

11. The App is a method by which patients can access the Patient Portal, in fulfillment of federal policy, and for HUP to avoid reduction in payments from the federal government.

12. The Website pennmedicine.org provides instructions on how to access the Patient Portal, and pennmedicine.org provides links to the Patient Portal, in fulfillment of federal policy and for HUP to avoid reduction in payments from the federal government.

13. Penn Medicine uses tracking technologies, such as cookies and Facebook pixels, to better understand the path users of Penn Medicine's consumer-facing website take to navigate to the Patient Portal and to make any necessary changes to remove obstacles to that navigation.

14. Now Plaintiff demands that a State court intervene and declare that HUP's use of Facebook technology violates state law, and demands injunctive relief to stop it.

15. This type of claim belongs in federal court. As set forth in detail below, two recent District Court decisions denied motions to remand under very similar circumstances. *See Doe v. UPMC*, No. 2:20-cv-359, 2020 U.S. Dist. LEXIS 136077 (W.D. Pa. July 31, 2020) (hereafter, "*UPMC*"), **Exhibit 3** and *Doe v. ProMedica Health Sys.*, No. 3:20 CV 1581, 2020 U.S. Dist.

LEXIS 244916 (N.D. Ohio Oct. 30, 2020) (hereafter, "*ProMedica*"), **Exhibit 4**. In each case, a plaintiff filed in state court; they filed a putative class action against a health system; that class action concerned the privacy of websites and/or patient portals; the defendant removed under the federal officer removal statute; plaintiff moved to remand; and the District Court denied the motion. The same situation exists here, and HUP should obtain the same result should removal be challenged.

16. Accordingly, HUP removes this action to the United States District Court for the Eastern District of Pennsylvania. In support of removal, HUP provides this "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a); *see also Dart Cherokee Basis Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) ("By design, § 1446(a) tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure.").[3]

## BASES FOR REMOVAL

**I.    Removal is Proper Pursuant to the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1).**

17. HUP removes this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which exists to protect operations of the federal government from State interference. *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 466 (3d Cir. 2015) ("*Def. Ass'n*"). Thus, "[u]nlike the general removal statute, the federal officer removal statute is to be 'broadly construed' in favor of a federal forum." *Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 811 (3d Cir. 2016) (citing *Def. Ass'n*). *See also*

---

[3] HUP appears here in the exercise of its rights of removal under federal law. HUP reserves all procedural, substantive, and other defenses, arguments, and claims available in response to the Complaint. HUP denies the Complaint has merit. HUP denies that the Complaint is factually accurate. HUP further denies that any class action could be certified in this matter.

*Willingham v. Morgan*, 395 U.S. 402 (1969) (noting that the scope of the federal officer removal statute "is not narrow or limited").

18. Removal under the federal officer statute is proper here because (1) the Trustees of the University of Pennsylvania, as owner and operator of HUP, is a "person" within the meaning of the statute; (2) Plaintiff's claims are based upon HUP's conduct in "acting under" the United States, its agencies, or its officers; (3) Plaintiff's claims are "for, or relating to" an act under color of federal office; and (4) HUP raises colorable federal defenses to the claims. *Def. Ass'n*, 790 F.3d at 467 (holding that state-court disputes were properly removed where they pertained to how a Pennsylvania non-profit administered authority delegated to it under federal law and how it utilized related federal funds).

A. **The Trustees of the University of Pennsylvania is a "Person."**

19. Any "person" acting under a federal officer may remove an action to federal court pursuant to Section 1442(a)(1).

20. "Because the statute does not define 'person,' [courts] look to 1 U.S.C. § 1, which defines the term to 'include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.'" *Papp*, 842 F.3d at 812.

21. The Trustees of the University of Pennsylvania, as owner and operator of HUP, is a registered Pennsylvania non-profit corporation. *See, e.g.*, *Complaint*, ¶ 9.

B. **HUP is Acting Under a Federal Officer.**

22. "The 'acting under' requirement, like the federal removal statute overall, is to be liberally construed to cover actions that involve an effort to assist, or to help carry out, the federal supervisor's duties or tasks." *Papp,* 842 F.3d at 812 (marks and citation omitted). *See also Def. Ass'n*, 790 F.3d at 468 (construing "acting under" liberally). "It is sufficient for the 'acting under'

inquiry that the allegations are directed at the relationship between the [Penn] and the [federal officer or agency]". *Id*.

23. The federal government has established specific offices to expand the use of EHR and other health IT. First, the government established the National Health Information Technology Coordinator by executive order. *See* Exec. Order 13335 (Apr. 27, 2004). That office was charged with overseeing "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id*.

24. Congress then codified this model in the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH Act"). That legislation created the Office of the National Coordinator for Health Information Technology ("ONC") and earmarked billions of federal dollars to help create, among other things, a "[h]ealth information technology architecture that will support the nationwide electronic exchange and use of health information in a secure, private, and accurate manner." 111 P.L. 5 § 3011(a)(1), 123 Stat. 115, 247 (2009) (codified at 42 U.S.C. § 300jj-31).

25. As noted by the District Court in *UPMC*:

> The HITECH Act gave the ONC much the same responsibilities and objectives as the 2004 executive order gave the National Coordinator, including coordinating and collaborating with the private healthcare sector. The Act also appropriated funds for DHHS to invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States. In that vein, the Act created the Meaningful Use Program. Under this program, eligible healthcare providers receive incentive payments from DHHS if they demonstrate "meaningful use" of certified EHR technology.

*UPMC* at *15-17 (quotation marks and citations omitted).

26. The District Court in *UPMC* further noted that the DHHS "structured the Meaningful Use Program in stages. At each progressive stage, DHHS increased the criteria required to receive greater incentive payments. For example, to receive incentive payments at

Stage 2, an eligible provider must, among other things, show that a certain percentage of patients' health records are available to the patients in an electronic format.  At Stage 3, an eligible provider must show that a certain percentage of patients have also actually accessed their records electronically…meeting the program's criteria relative to patient participation and usership requires raising awareness of a provider's website and patient portal, as well as ensuring that the website and portal are engaging and user-friendly."  2020 U.S. Dist. LEXIS 136077 at *17.

27. Thus, the District Court in *UPMC* concluded, "Plaintiffs' Complaint addresses the design and functionality of UPMC's website and patient portal, implicating UPMC's implementation of the Meaningful Use Program, particularly as the implementation involves patient engagement and usership."  2020 U.S. Dist. LEXIS 136077 at *18.  In determining that UPMC's relationship with the federal government was akin to a government contractor relationship, the Court was especially impressed by "[t]he fact that the government offers payment in exchange for UPMC's voluntary participation in implementing a nationwide EHR network[.]"  *Id*.  "And, Plaintiffs' allegations are directed at this relationship. UPMC is therefore 'acting under' a federal superior for purposes of the federal officer removal statute."  *Id*.

28. CMS was tasked with administering the incentive payments.  *ProMedica*, 2020 U.S. Dist. LEXIS 244916 at *3.

29. Starting in 2011, Penn Medicine and its providers ("Penn Providers"), including HUP, obtained financial incentives from Medicare and Medicaid for being "meaningful EHR users," as defined by CMS, thereby assisting the federal government in meeting its goals of expanding access to and use of EHRs through the meaningful use program, currently known as the Medicare Promoting Interoperability Program ("Interoperability Program").  *See* Declaration of Anna Schoenbaum, ("Schoenbaum Decl.") at ¶ 7, attached as **Exhibit 5**.

7

30. Starting in 2015, Penn Providers avoided reductions in payments from Medicare and Medicaid by remaining "meaningful EHR users," as defined by CMS, thereby assisting the federal government in meeting its goals of expanding access to and use of EHRs. *Id*. ¶ 8.

31. For example, CMS evaluates each eligible provider annually on meeting the required objectives and measures of the Interoperability Program. *See* CMS, MEDICARE PROMOTING INTEROPERABILITY PROGRAM ELIGIBLE HOSPITALS, CRITICAL ACCESS HOSPITALS, AND DUAL-ELIGIBLE HOSPITALS ATTESTING TO CMS OBJECTIVES AND MEASURES FOR 2020; *Medicare Promoting Interoperability Program Eligible Hospitals, Critical Access Hospitals, and Dual-Eligible Hospitals Attesting to CMS Objectives and Measures for the 2021 Reporting Period*; and *Medicare Promoting Interoperability Program for Eligible Hospitals and Critical Access Hospitals*: *Objectives and Measures for the 2022 EHR Reporting Period*, attached as hereto as **Exhibit 6** (hereafter, "*CMS Objectives*").

32. Eligible providers are evaluated each year on a scale of up to 100 points. *CMS Objectives,* p. 2, Scoring Information.

33. Eligible providers who obtain less than 60 points "are not considered meaningful users, and may undergo a downward payment adjustment". *Id*.

34. Up to forty (40) points are available for providing patients electronic access to their health records. *Id*.

35. To "provide access" per CMS, is not just to have a patient portal in place. Rather, CMS defines "Provide Access" as follows:

> **Provide Access:** When a patient possesses all of the necessary information needed to view, download, or transmit their information. This could include providing patients with instructions on how to access their health information, the website address they must visit for online access, a unique and registered username or password, instructions on how to create a login, or any other instructions, tools, or

materials that patients need in order to view, download, or transmit their information.

36. Pennmedicine.org is one means by which Penn Medicine provides access to the Patient Portal. Schoenbaum Decl. at ¶ 15.

37. If a website user visits pennmedicine.org, they are immediately presented with an option For Patients and Visitors.



38. Clicking that option, the website user is presented with options including "Make an Appointment at Penn Medicine" and "Access myPennMedicine".

9

39. When clicking on "Make An Appointment With Penn Medicine", the website user is taken to https://www.pennmedicine.org/make-an-appointment and a button is presented to "Login to myPennMedicine". This is Penn Medicine "providing access" consistent with *CMS Objectives*, in fulfillment of CMS policy, and to avoid reduction in payments.



40. Clicking "Access myPennMedicine" takes the website user directly to the Patient Portal. This is Penn Medicine "providing access" consistent with *CMS Objectives*, in fulfillment of CMS policy, and to avoid reduction in payments.

41. Penn Medicine uses tracking technologies, such as cookies and Facebook pixels, to better understand the path users of Penn Medicine's consumer-facing website take to navigate to the Patient Portal and to make any necessary changes to remove obstacles to that navigation. Schoenbaum Decl. ¶ 16. This is in support of Penn Medicine "providing access" consistent with *CMS Objectives*, in fulfillment of CMS policy, and avoiding reduction in reimbursement.

42. Federal review of this lawsuit seeking to enjoin use of Facebook technology is therefore warranted pursuant to 28 U.S.C. § 1442(a)(1).

### C. Plaintiff's Claims Relate to Actions Under Color of Federal Office.

43. For removal pursuant to Section 1442(a)(1), the alleged conduct must "have been undertaken 'for or relating to' a federal office." *Papp*, 842 F.3d at 813. To satisfy this aspect of removal, "it is sufficient for there to be a 'connection' or 'association' between the act in question and the federal office." *Def. Ass'n*, 790 F.3d at 471; *see also Papp*, 842 F.3d at 813 (holding recent amendments to statute have fostered "a more permissive view" of this element).

44. There is more than a connection or association between HUP's alleged conduct and the actions of Penn Providers in meeting federal program criteria. The Complaint alleges that tracking online behaviors and utilizing direct marketing in conjunction with patient portals and public medical websites violates Pennsylvania privacy law. But these are methods for communicating with patients, increasing their awareness of the Patient Portals, and expanding the use of EHR—exactly in furtherance of CMS Objectives.

45. These allegations are inextricably tied to—and certainly "connected" and "associated" with—HUP's effort to meet federal program criteria. *Def. Ass'n*, 790 F.3d at 471. If Plaintiff was to prevail in showing that the most common online methods for meeting those benchmarks violate statutory law, it would substantially interfere with achieving the policy objectives set forth in the HITECH Act and its implementing regulations. *Golden v. New Jersey Inst. of Tech.*, 934 F.3d 302, 310 (3d Cir. 2019) ("The central aim of the federal officer removal statute is to protect officers of the federal government from interference by litigation in state court" (marks and citation omitted)). Federal review pursuant to 28 U.S.C. § 1442(a)(1) is therefore warranted.

### D. Penn Raises Colorable Federal Defenses to Plaintiff's Claims.

46. The final element for federal officer removal requires that HUP identify a federal defense. *Def. Ass'n*, 790 F.3d at 472. This, too, is broadly construed in favor of federal jurisdiction. *Id*. at 472-74. Arguments that federal law preempts state law suffice to warrant removal under this element. *Id*. at 473-74. Similarly, where a complaint alleges the presence of a duty under federal law, a federal defense exists for removal purposes where the defendant denies it violated any such duty. *Id*. at 473 (holding this element satisfied because defendant "claim[ed] that it was not violating the terms of" a federal statute); *see also Golden*, 934 F.3d at 311 (holding that defendant raised a colorable federal defense by denying that the records at issue "are federal records within the meaning of 44 U.S.C. § 3301").

47. HUP will assert at least three colorable federal defenses to the claims at issue here.

48. First, HUP asserts that it did not violate HIPAA. The *UPMC* court noted, "Plaintiffs plainly allege that UPMC has a federal duty under HIPAA and that UPMC violated that duty. Because UPMC denies violating its duties under HIPAA, UPMC raises a colorable federal defense." *UPMC*, 2020 U.S. Dist. LEXIS 136077, at *21. The same is certainly true here. The Complaint is rife with reference to HIPAA.[4] *See Complaint* ¶¶ 55-60. HUP denies that it violated any law, including HIPAA.

49. Second, HUP will assert a defense under the Dormant Commerce Clause. The Dormant Commerce Clause blocks states from interfering with interstate commerce. Any "state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause." *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989). And, "[b]ecause the internet does not recognize geographic boundaries, it is difficult, if not

---

[4] The Complaint references the Health Insurance Portability and Accountability Act of 1996 as "HIPPA". *See* Complaint ¶ 55.

12

impossible, for a state to regulate internet activities without 'projecting its legislation into other States.'" *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (citation omitted).

50. Here, Penn Providers are located in multiple States, including Pennsylvania and New Jersey. The Websites provide an easily accessible, interstate (and international) platform by which providers, patients, and others can manage or learn more about their or others' healthcare. But according to the Complaint in this case, Pennsylvania law—including the legislative proscriptions of the Commonwealth's wiretapping statute—restricts how Penn Medicine can design and manage those websites. The Dormant Commerce Clause prohibits Pennsylvania from reaching beyond its borders in that way. *Accord*, *UPMC*, 2020 U.S. Dist. LEXIS 136077, at *24 ("Because the dormant Commerce Clause is federal law, and because it presents a defense that is legitimate and could reasonably be asserted, given the facts presented and the current law, UPMC has raised a colorable federal defense") (citations and quotation marks omitted).

51. Third, the entire nature of HUP's involvement in the Interoperability Program is "inherently federal in character because the relationship" between Penn and CMS "originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (holding that state law claims stemming from defendant's representations to a federal agency were preempted). Federal judicial review is available to assess allegations about the nature of that relationship. *See Def. Ass'n*, 790 F.3d at 474 (permitting removal on the basis of *Buckman* preemption). *Accord*, *UPMC*, 2020 U.S. Dist. LEXIS 136077, at *23 ("In sum, UPMC's HIPAA preemption and *Buckman* preemption defenses are colorable federal defenses").

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

52. HUP has satisfied all the procedural requirements for removal under 28 U.S.C. § 1446.

53. HUP files this Notice of Removal pursuant to 28 U.S.C. § 1441(a) in the United States District Court for the Eastern District of Pennsylvania, because the State court in which the action is pending, the Court of Common Pleas for Philadelphia County, is within this federal judicial district. This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

54. Plaintiff served the Complaint on Penn on or after January 26, 2023. HUP removed the case within 30 days of that date; therefore, this removal is timely under 28 U.S.C. § 1446(b). *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354-56 (1999).

55. A copy of "all process, pleadings, orders, and other documents then on file in the State Court," are attached hereto as Exhibit 1 in accordance with 28 U.S.C. § 1446(a).

56. In accordance with 28 U.S.C. § 1446(d), promptly after filing this Notice, HUP will "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the Court of Common Pleas of Philadelphia County. A true and correct copy of the Notice to Plaintiff and Notice to the State Court of Filing of Notice of Removal will be filed as separate documents.

57. Nothing in this Notice of Removal shall be interpreted as a waiver or relinquishment of HUP's right to assert any and all defenses or objections to the Complaint, including but not limited to Plaintiff's class allegations.

58. If there are any questions that arise as to the propriety of removal of this action, HUP respectfully requests the opportunity to submit briefing, argument, and additional evidence as necessary to support removal of this case.

Dated: February 24, 2023                                         Respectfully submitted,

                                                                 /s/ *Mark S. Melodia*
                                                                 Mark S. Melodia (I.D. No. 53515)
                                                                 HOLLAND & KNIGHT LLP

        Cira Centre, Suite 800
        2929 Arch Street
        Philadelphia, PA 19104
        (212) 513-3583
        Mark.Melodia@hklaw.com

*Counsel for Defendant*

# **CERTIFICATE OF SERVICE**

I, Mark S. Melodia, hereby certify that on this 24th day of February, 2023, a true and correct copy of the foregoing Notice of Removal was served upon all counsel of record via the ECF system and Electronic Mail, as follows:

**ATTORNEYS FOR PLAINTIFF
AND PUTATIVE CLASS**

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
Steven A. Schwartz (I.D. No. 50579)
361 W. Lancaster Avenue
Haverford, PA  19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn*
Philip L. Fraietta*
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com, pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly*
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Tel: (305) 330-5512
Fax: (305) 676-9006
E-Mail: creilly@bursor.com

**DRURY LEGAL, LLC**
Scott R. Drury*
6 Carriage Lane
Highwood, Illinois 60040
Tel: (312) 358-8225
E-Mail: scott@drurylegal.com

*Pro Hac Vice Application Forthcoming*

                                                */s/ Mark S. Melodia*
                                                Mark S. Melodia