# EXHIBIT 1A

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

**JANUARY 2023**

E-Filing Number: 2301043648

**002149**

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| JOHNATHON MOHR | THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 2122 CAROL LANE<br>EAST NORRITON PA 19401 | 801 SPRUCE STREET<br>PHILADELPHIA PA 19107 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 1 | 1 | ☒ Complaint  ☐ Petition Action  ☐ Notice of Appeal<br>☐ Writ of Summons  ☐ Transfer From Other Jurisdictions |

**AMOUNT IN CONTROVERSY**

☐ $50,000.00 or less
☒ More than $50,000.00

**COURT PROGRAMS**

☐ Arbitration  ☐ Mass Tort  ☐ Commerce  ☐ Settlement
☒ Jury  ☐ Savings Action  ☐ Minor Court Appeal  ☐ Minors
☐ Non-Jury  ☐ Petition  ☐ Statutory Appeals  ☐ W/D/Survival
☐ Other:

**CASE TYPE AND CODE**

2E - WRONGFUL USE OF CIVIL PROCESS

**STATUTORY BASIS FOR CAUSE OF ACTION**

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | FILED PRO PROTHY | IS CASE SUBJECT TO COORDINATION ORDER?<br>YES          NO |
|---|---|---|
| | JAN 23 2023<br>**S. RICE** | |

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: JOHNATHON MOHR

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| STEVEN A. SCHWARTZ | 361 WEST LANCASTER AVE<br>ONE HAVERFORD CENTRE<br>HAVERFORD PA 19041 |

| PHONE NUMBER | FAX NUMBER |
|---|---|
| (610)642-8500 | (610)649-3633 |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 50579 | sas@chimicles.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| STEVEN SCHWARTZ | Monday, January 23, 2023, 10:44 am |

FINAL COPY (Approved by the Prothonotary Clerk)

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA**

*Filed and Attested by the Office of Judicial Records 23 JAN 2023 10:44 am S. RICE*

| | |
|---|---|
| JOHNATHON MOHR, for himself and others similarly situated, | CIVIL DIVISION |
| Plaintiff, | Case No. _____ |
| v. | **CLASS ACTION COMPLAINT** |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Johnathon Mohr ("Plaintiff"), on behalf of himself and all other similarly situated individuals (the "Class Members") against The Trustees of the University of Pennsylvania ("Defendant") which operates, controls and manages the Hospital of the University of Pennsylvania Health System ("Penn Medicine") brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

### NATURE OF THE ACTION

1.     This is a class action lawsuit brought on behalf of all Pennsylvania residents who have accessed and used the myPennMedicine app (the "App") or any of the following websites that Defendant owns and operates: pennmedicine.org; pennbehavioralhealth.org; and/or uphs.upenn.edu.

1

Case ID: 230102149

2.      Defendant aids employs, agrees, and conspires with Facebook/Meta[1] to intercept communications sent and received by Plaintiff and Class Members, including communications containing protected medical information.  Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this action pursuant to Pa. Cons. Art. 5, §5(b) and 42 Pa. C.S.A. § 931(b).

4.      The Court has personal jurisdiction over Defendant pursuant to 42 Pa. C.S.A. 5301(a)(2).

5.      Venue is proper pursuant to Pa. R. Civ. P. 2179(a)(1) because Defendant's principal place of business is located in this County

## THE PARTIES

### *Plaintiff Mohr*

6.      Plaintiff Johnathon Mohr is an adult citizen of the Commonwealth and is domiciled in Norristown, Pennsylvania.

7.      From 2020 to 2022, Plaintiff Mohr used the pennmedicine.org website and patient portal to schedule an appointment and access medical results.  Plaintiff Mohr accessed the website using a tablet and desktop computer. As described below, each time Plaintiff Mohr booked medical appointments, he disclosed medical information regarding his medical condition, history or treatment.

---

[1] In October 2021, Facebook, Inc. changed its name to Meta, Inc.  Unless otherwise indicated, Facebook, Inc. and Meta, Inc. are referenced collectively herein as "Facebook."

2

Case ID: 230102149

8.     Plaintiff Mohr also has an active Facebook account which he has maintained since 2020.  Plaintiff Mohr accesses his Facebook account from multiple devices, including his tablet, smartphone and desktop computer.

*Defendant*

9.     Defendant The Trustees of the University of Pennsylvania is a registered nonprofit entity with its principal place of business in Pennsylvania.  Defendant employs approximately 20,433 individuals.  As of June 2021, Defendant reported revenue of approximately $9.3 billion and total assets of approximately $31 billion.  Through Penn Medicine, Defendant offers a full range of medical services, including primary, inpatient and outpatient care, and treats thousands of patients each year.

10.     Pursuant to the systematic process described herein, Defendant, through Penn Medicine, assisted Facebook with intercepting Plaintiff's communications, including those that contained personally identifiable information, protected health information and related confidential information.  Defendant assisted these interceptions without Plaintiff's knowledge, consent or express written authorization.

11.     By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected health information.

## FACTUAL ALLEGATIONS

*The Pennsylvania Wiretapping and Electronic Surveillance Control Act*

12.     The Pennsylvania Wiretapping and Electronic Surveillance Control Act (the "Pennsylvania Wiretapping Act") prohibits: (a) the interception or procurement of another to intercept any wire, electronic or oral communication; (b) the intentional disclosure of the contents

3

Case ID: 230102149

of any wire, electronic or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic or oral communication; and (c) the intentional use of the contents of any wire, electronic or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic or oral communication.  18 Pa. Cons. Stat. § 5703.

13.     Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose or use, a wire, electronic, or oral communication in violation of the Pennsylvania Wiretapping Act is subject to a civil action for: (a) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

14.     Under the Pennsylvania Wiretapping Act, "intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device."  18 Pa. Cons. Stat. § 5702.

15.     Under the Pennsylvania Wiretapping Act, "contents" is defined as "used with respect to any wire, electronic or oral communication, is any information concerning the substance, purport, or meaning of that communication."  18 Pa. Cons. Stat. § 5702.

16.     Under the Pennsylvania Wiretapping Act, "person" is defined as "any individual, partnership, association, joint stock company, trust or corporation."  18 Pa. Cons. Stat. § 5702.

17.     Under the Pennsylvania Wiretapping Act, "electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system."  18 Pa. Cons. Stat. § 5702.

4

Case ID: 230102149

18.     Pursuant to the Pennsylvania Wiretapping Act, the Commonwealth and any of its officers, officials or employees who may be shielded from liability under the Pennsylvania Wiretapping Act by the doctrine of sovereign immunity waive such immunity.  18 Pa. Const. Stat. § 5725(b).

### Penn Medicine and Its Website

19.     Penn Medicine has six acute care hospitals, eight multispecialty centers and hundreds of outpatient locations within the Commonwealth.  In fiscal year 2021, Penn Medicine had: (a) approximately 6.5 million outpatient visits; (b) over 337,000 emergency department visits; and (c) over 3,400 hospital beds.

20.     Penn Medicine offers a full range of medical services, including primary, inpatient and outpatient care.

21.     Penn Medicine has three websites – pennmedicine.org; pennbehavioralhealth.org; and uphs.upenn.edu – that are accessible on mobile devices and desktop computers.  Penn Med also offers the App for download on Android and iPhone devices.

### Facebook's Platform and Business Tools

22.     Facebook describes itself as a "real identity platform,"[2] meaning users are allowed only one account and must share "the name they go by in everyday life."[3]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[4]

---

[2] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[3] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[4] FACEBOOK, SIGN UP, https://www.facebook.com/

Case ID: 230102149

23.     In 2021, Facebook generated $117 billion in revenue.[5]  Roughly 97% of that came from selling advertising space.[6]

24.     Facebook sells advertising space by highlighting its ability to target users.[7] Facebook can target users so effectively because it surveils user activity both on and off its site.[8] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[9]  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

25.     Advertisers can also build "Custom Audiences."[11]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12]  With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from

---

[5] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx
[6] *Id.*
[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[8] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.
[10] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.
[11] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[12] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

Case ID: 230102149

your source audience to find new people who share similar qualities."[13]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  Advertisers can do so through two mechanisms: (a) by manually uploading contact information for customers; or (b) by utilizing Facebook's "Business Tools."[14]

26.     As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[15]  Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

27.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, the webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[16]  Facebook's Business Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers

---

[13] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[15] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.
[16] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

Case ID: 230102149

can choose, including what content a visitor views or purchases.[17]  Advertisers can even create

their own tracking parameters by building a "custom event."[18]

28.     One such Business Tool is the Facebook Tracking Pixel.  Facebook offers this piece

of code to advertisers, like Defendant, to integrate into their websites.  As the name implies, the

Facebook Tracking Pixel "tracks the people and type of actions they take."[19]  When a user accesses

a website hosting the Facebook Tracking Pixel, Facebook's software script surreptitiously directs

the user's browser to send a separate message to Facebook's servers.  This second, secret

transmission contains the original GET request sent to the host website, along with additional data

that the Facebook Tracking Pixel is configured to collect.  This transmission is initiated by

Facebook code and concurrent with the communications with the host website.  Two sets of code

are thus automatically run as part of the browser's attempt to load and read Defendant's websites—

Defendant's own code and Facebook's embedded code.

29.     An example illustrates the point.  Take an individual who navigates to one of

Defendant's websites and clicks on a tab for allergy information.  When that tab is clicked, the

individual's browser sends a GET request to Defendant's server requesting that server to load the

particular webpage.  Because Defendant utilizes the Facebook Tracking Pixel, Facebook's

embedded code, written in JavaScript, sends secret instructions back to the individual's browser,

without alerting the individual that this is happening.  Facebook causes the browser to secretly and

concurrently duplicate the communication with the Penn Medicine website at issue, transmitting

---

[17] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also*
FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-
api/.
[19] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

Case ID: 230102149

it to Facebook's servers, alongside additional information that transcribes the communication's content and the individual's identity.

30.     After collecting and intercepting this information, Facebook processes it, analyzes it and assimilates it into datasets like Core Audiences and Custom Audiences.

***How Defendant Discloses Plaintiff's and Class Members' Protected Health Information and Assists with Intercepting Communications***

31.     Through the Facebook Tracking Pixel, Defendant – via Penn Medicine's websites – shares Penn Medicine's patients' identities and online activity, including information and search results related to their private medical treatment.

32.     An investigation by *The Markup* revealed that thirty-three of the top 100 hospitals in the United States, as ranked by *Newsweek*, have the Facebook Tracking Pixel embedded on the appointment schedule pages of their websites, among other possible places.[20]  Penn Medicine is one of the identified websites.[21]

33.     According to the Markup Investigation, the hospital websites are "collecting patients' sensitive health information – including details about their medical conditions, prescriptions, and doctor's appointments – and sending it to Facebook."[22]

34.     The Markup Investigation further revealed that the data sent to Facebook is connected to: (a) the IP address of the computer sending the information, providing Facebook with the ability to connect the sensitive information to specific individual or household; or, worse: (b)

---

[20] Todd Feathers, *et al.*, FACEBOOK IS RECEIVING SENSITIVE MEDICAL INFORMATION FROM HOSPITAL WEBSITES, THE MARKUP ("Markup Investigation") (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.
[21] *Id.*
[22] *Id.*

Case ID: 230102149

a specific Facebook user if the user is logged into their Facebook account when using the websites at issue.[23]

35.     The Markup Investigation provided the following examples of the types of information surreptitiously intercepted by Facebook: (a) "clicking the 'Schedule Online' button on a doctor's page [of a specified hospital] prompted the [Facebook Tracking Pixel] to send Facebook the text of the button, the doctor's name, and the search term we used to find her: 'pregnancy termination'"; and (b) clicking the "Schedule Online Now' button on a different website "prompted the [Facebook Tracking Pixel] to send Facebook the text of the button, the doctor's name, and the condition we selected from the dropdown menu: "Alzheimer's."[24]

36.     The startling information revealed in the Markup Investigation prompted a former senior privacy advisor for the U.S. Department of Health and Human Services' Office for Civil Rights ("Office for Civil Rights") to remark on the troubling nature of the conduct: "I am deeply troubled by what [the hospitals] are doing with the capture of [patients'] data and the sharing of it."[25]

*How Penn Medicine Discloses Protected Health Information*

37.     Penn Medicine allows patients to select options like "Find a Doctor," "Find a Location," "Make an Appointment," and "Pay Your Bill."

---

[23] *Id.*
[24] *Id.*
[25] *Id.*

Case ID: 230102149



38.     When patients click "Find a Doctor," they can search by "[c]ondition, treatment, speciality, or name."



11

Case ID: 230102149

39.     When patients click "Make an Appointment," they can click on an option to schedule an appointment through the "myPennMedicine" portal.



40.     Upon information and belief, whenever patients search their treatment or condition, or whenever patients schedule an appointment, Defendant procures Facebook to intercept communications that contain protected health information.

41.     Each time Defendant sends this content, it also discloses a patient's personally identifiable information, including their Facebook ID ("FID").  An FID is a unique and persistent identifier that Facebook assigns to each user.  With it, any ordinary person can look up the user's Facebook profile and name.  Notably, while Facebook can easily identify any individual on its own Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID.  Facebook admits as much on its website.  Indeed, to find a corresponding profile, a person need only attach the FID to the end of the URL for Facebook, typing in Facebook.com/[FID].

12

Case ID: 230102149

42.     A user who accesses Defendant's website while logged into Facebook will transmit what is known as the "c_user cookie" to Facebook, which contains that user's unencrypted Facebook ID.

43.     When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies.

44.     One such cookie is the "fr cookie" which contains, at least, an unencrypted Facebook ID and browser identifier.  Facebook, at a minimum, uses the fr cookie to identify users.[26]

45.     If a visitor has never created an account, an even small set of cookies are transmitted.

46.     At each stage, Defendant also utilizes the "_fbp cookie," which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user. [27]

47.     The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook. [28]  If that happens, the time resets, and another 90 days begins to accrue. [29]

48.     The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website. [30]  If that happens, the time rests, and another 90 days begins to accrue. [31]

---

[26] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[27] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[28] See FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[29] Confirmable through developer tools.
[30] See FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[31] Also confirmable through developer tools.

Case ID: 230102149

49.     The Facebook Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Penn Medicine. [32]   A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook. [33]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

50.     Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.  Defendant sends these identifiers alongside the event data.

51.     Plaintiff never consented, agreed, or otherwise permitted Penn Medicine to disclose his personally identifiable information and protected health information.  Plaintiff was never provided with any written notice that Defendant disclosed his users' protected health information, nor was he provided any means of opting out of such disclosures.  Defendant nonetheless knowingly disclosed Plaintiff's protected health information to Facebook.

52.     By law, Plaintiff is entitled to privacy in his protected health information and confidential communications.  Defendant deprived Plaintiff of his privacy rights by procuring Facebook to intercept these communications by implementing a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and other patients' confidential communications, personally identifiable information, and protected health information.  Plaintiff did not discover

---

[32] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[33] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

Case ID: 230102149

that Defendant disclosed his personally identifiable information and protected health information to Facebook, and assisted Facebook with intercepting his communications, until January 2023.

**The Expectation of Privacy in Healthcare Information**

53.     An individual's medical records and information are among the most sensitive type of personal information.

54.     Indeed, the Commonwealth requires that medical records be treated as confidential. 28 Pa. Code § 115.27.

55.     Similarly, the Health Insurance Portability and Accountability Act of 1996 ("HIPPA") imposes strict standards to protect sensitive patient health information from being disclosed without the patients' knowledge and consent.  *See* 45 C.F.R. § 160, *et seq.*

56.     On December 1, 2022, the Office for Civil Rights issued a bulletin titled *Use of Online Tracking Technologies by HIPPA Covered Entities and Business Associates* (the "Bulletin") in which it addressed the impropriety of healthcare providers utilizing tracking technologies such as the Facebook Tracking Pixel in a manner that impermissibly discloses protected health information ("PHI") in violation of the HIPPA.[34]

57.     According to the Office for Civil Rights, "**[r]egulated entities** [those to which HIPPA applies] **are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of [protected health information] to tracking technology vendors or any other violations of the HIPPA Rules.**"[35] As set forth in the Bulletin, "disclosures

---

[34] U.S. Dep't of Health and Human Services – Office for Civil Rights, Use of Online Tracking Technologies by HIPPA Covered Entities and Business Associates (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.
[35] *Id.* (emphasis in original).

Case ID: 230102149

of PHI to tracking technology vendors for marketing purposes, without individuals' HIPPA-compliant authorizations, would constitute impermissible disclosures."[36]

58.    Outside of HIPPA, the Office for Civil Rights warned that an impermissible disclosure of an individual's PHI could result in a wide range of additional harms to the individual or others.[37] "For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or others identified in the individual's PHI."[38]

59.    The Office for Civil Rights noted the broad range of information that constitutes PHI, including "individually identifiable health information" ("IIHI") such as "an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code."[39] According to the Bulletin, IIHI can constitute PHI because:

> when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (*i.e.*, it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[40]

60.    The Office for Civil Rights concluded that "it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPPA Privacy Rule."[41]

---

[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.* (emphasis in original).

Case ID: 230102149

61.     As a result of Defendant's conduct, as alleged herein, Plaintiff and Class Members have been exposed to the harms and impending harms described in the Bulletin.

62.     Moreover, "courts have recognized the 'growing trend across courts . . . to recognize the lost property value' of personal information. *In re Marriott Int'l, Inc., Cust. Data Sec. Breach Litig.*, 440 F.Supp.3d 447, 461 (D. Md. 2020) . . .; *see also In re Facebook Privacy Litigation*, 557 F.App'x. 494, 494 [sic] (9th Cir. 2014)." *Calhoun v. Google LLC*, 526 F.Supp.3d 605, 636 (N.D. Cal. 2021).

## CLASS ACTION ALLEGATIONS

63.     Plaintiff, pursuant to Rules 1702, 1708 and 1709 of the Pennsylvania Rules of Civil Procedure, asserts this action individually and on behalf of the following Class: All natural persons in the Commonwealth of Pennsylvania whose personal information was collected through the Facebook Tracking Pixel.

64.     Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division and/or to add subclasses after having had an opportunity to conduct discovery.

65.     Excluded from the Class are: (a) Defendant; (b) any parent, affiliate or subsidiary of Defendant; (c) any entity in which Defendant has a controlling interest; (d) any of Defendant's officers or directors; (e) any successor or assign of Defendant; (f) any judge or court personnel assigned to this case and members of their immediate families; and (g) Plaintiff's counsel and Defendant's counsel and anyone employed by them.

66.     **Numerosity.**  Consistent with Pennsylvania Rule of Civil Procedure 1702(1), the Class is so numerous that joinder of all members is impracticable.  While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the Class contains at least hundreds

17

Case ID: 230102149

of thousands of individuals, and the members can be identified through Defendant's records.  Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media and/or published notice.

67.    **Commonality.**  Consistent with Pennsylvania Rule of Civil Procedure 1702(2), common questions of law and fact exist as to all Class Members.  These common questions of law or fact predominate over any questions affecting only individual members of the Class.  Common questions include, but are not limited to the following:

a.  Whether Plaintiff and Class Members had a reasonable expectation of privacy in their sensitive health information communicated to their healthcare providers;

b.  Whether Defendant violated Plaintiff's and Class Members' privacy rights;

c.  Whether Defendant intentionally tapped the lines of internet communication between Plaintiff and Class Members and their medical providers;

d.  Whether Penn Medicine's websites surreptitiously record personally identifiable information, protected health information and related communications and simultaneously, or subsequently, discloses that information to Facebook.

e.  Whether Facebook is a third-party eavesdropper;

f.  Whether Defendant's disclosure of personally identifiable information, protected health information and related communications constitutes an affirmative act of communication;

g.  Whether Defendant's actions violated the Pennsylvania Wiretapping Act; and

h.  Whether Plaintiff's and Class Members are entitled to damages under the Pennsylvania Wiretapping Act.

18

Case ID: 230102149

68.   **Typicality.**   Consistent with Pennsylvania Rule of Civil Procedure 1702(3), Plaintiff's claims are typical of the claims of the Class he seeks to represent because Plaintiff and all Class Members have suffered similar injuries as a result of the same practices alleged herein. Plaintiff has no interests to advance adverse to the interests of the other Class Members, and Defendant has no defenses unique to any Plaintiff.

69.   **Adequate Representation.**   Consistent with Pennsylvania Rule of Civil Procedure 1702(4) and 1709, Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class and has retained as his counsel attorneys competent and experienced in class actions and complex litigation, including litigation to remedy privacy violations.  Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of Class Members, and they have the resources to do so.

70.   **Predominance.**   Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(1), common questions of law and fact predominate over any questions affecting only individual class members.  For example, Defendant's liability and the fact of damages is common to all members of the Class.

71.   **Superiority and Manageability.**   Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(2), a class action is superior to other available means for the fair and efficient adjudication of this dispute.  The injury suffered by each Class Member, while meaningful on an individual basis, may not be of such magnitude as to make the prosecution of individual actions against Defendant economically feasible.   Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system.  Moreover, individual litigation of the legal and factual issues of the case would increase the delay and expense to all parties and the court system.  A class action, however, presents far fewer management difficulties

Case ID: 230102149

and provides the benefit of single adjudication, economy of scale and comprehensive supervision by a single court.

72.   **Risk of Inconsistent, Varying, or Prejudicial Adjudications.**   Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(3), a class action will minimize the risk of inconsistent, varying or prejudicial adjudications.  If Plaintiff's and Class members' claims were tried separately, Defendant would be confronted with incompatible standards of conduct and divergent court decisions.

73.   **Litigation Already Commenced.**   Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(4), to Plaintiff's knowledge, there are no other cases that have been brought against Defendant, or that are currently pending against Defendant, where Pennsylvania consumers seek to represent a class of Pennsylvania residents based on conduct alleged in this Complaint.

74.   **Appropriateness of Forum.**   Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(5), the most appropriate forum to concentrate the litigation is this County because Defendant is headquartered in this County and a substantial number of Class members were injured in this County.

75.   **Support for Class Certification.**   Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(6) and (7), there is support for a class to be certified because of the relatively low amount recoverable by each Class member and the expenses of individual litigation.

76.   **The General Applicability of Defendant's Conduct.**   Consistent with Pennsylvania Rule of Civil Procedure 1708(b)(2), Defendant's conduct is generally applicable to the class as a whole, making relief appropriate with respect to each Class member.

Case ID: 230102149

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Pennsylvania Wiretapping Act
### 18 Pa. Cons. Stat. § 5701, *et seq.*

77.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

78.     Plaintiff brings this Count individually and on behalf of the members of the Class.

79.     The Pennsylvania Wiretapping Act prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication.  18 Pa. Cons. Stat. § 5703.

80.     Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.  18 Pa. Cons. Stat. § 5725(a).

81.     At all relevant times, Defendant procured Facebook to track and intercept Plaintiff's and Class members' internet communications while navigating the App or any of the following websites that Defendant owns and operates: pennmedicine.org; pennbehavioralhealth.org; and/or uphs.upenn.edu.   They intercepted these communications without authorization and consent from Plaintiff and Class members.

21

Case ID: 230102149

82.     Defendant, when procuring Facebook to intercept Plaintiff's communications, intended Facebook to learn the meaning of the content the visitor requested.

83.     Plaintiff and Class members had a justified expectation under the circumstances that their electronic communications would not be intercepted.

84.     Plaintiff and Class members were not aware that their electronic communications were being intercepted by Facebook.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.     Determining that this action is a proper class action;

b.     For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

c.     For an order declaring that Defendant's conduct violates the statute referenced herein;

d.     For an order finding in favor of Plaintiff and the Class on the count asserted herein;

e.     Award compensatory damages, including statutory damages where available, to Plaintiff and the Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f.     For punitive damages, as warranted, in an amount to be determined at trial;

g.     Ordering Defendant to disgorge revenues and profits wrongfully obtained;

h.     For prejudgment interest on all amounts awarded;

i.     For injunctive relief as pleaded or as the Court may deem proper;

j.     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

Case ID: 230102149

     k.      Grant Plaintiff and the Class members such further relief as the Court deems

appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

Dated:  January 23, 2023             Respectfully submitted,

                    By:     *Steven A. Schwartz*
                    **CHIMICLES SCHWARTZ KRINER**
                     **& DONALDSON-SMITH LLP**
                    Steven A. Schwartz (PA I.D. No. 50579)
                    361 W. Lancaster Avenue
                    Haverford, PA  19041
                    Tel: (610) 642-8500
                    Fax: (610) 649-3633
                    E-Mail: sas@chimicles.com

                    **BURSOR & FISHER, P.A.**
                    Joshua D. Arisohn*
                    Philip L. Fraietta*
                    888 Seventh Avenue
                    New York, NY 10019
                    Tel: (646) 837-7150
                    Fax: (212) 989-9163
                    E-Mail: jarisohn@bursor.com
                                pfraietta@bursor.com

                    **BURSOR & FISHER, P.A.**
                    Christopher R. Reilly*
                    701 Brickell Ave., Suite 1420
                    Miami, FL 33131-2800
                    Telephone: (305) 330-5512
                    Facsimile: (305) 676-9006
                    E-Mail: creilly@bursor.com

                    **DRURY LEGAL, LLC**
                    Scott R. Drury*
                    6 Carriage Lane
                    Highwood, Illinois 60040
                    Telephone: (312) 358-8225
                    E-Mail: scott@drurylegal.com

                    *\*Pro Hac Vice Application Forthcoming*

                    *Attorneys for Plaintiff and the Putative Class*

Case ID: 230102149

# FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## COURT OF COMMON PLEAS OF PHILADELPHIA

*Filed and Attested by the
Office of Judicial Records
23 JAN 2023 10:44 am
S. RICE*

JOHNATHON MOHR, for himself and others similarly situated,

Plaintiff,

v.

THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,

Defendant.

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| **You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.** | **Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion.  Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion.  Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda.  Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.** |
| *You should take this paper to your lawyer at once.  If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.* | *Lleve esta demanda a un abogado immediatamente.  Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio.  Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.* |
| **Philadelphia Bar Association<br>Lawyer Referral<br>and Information Service<br>One Reading Center<br>Philadelphia, Pennsylvania  19107<br>(215) 238-6333<br>TTY (215) 451-6197** | **Asociacion De Licenciados<br>De Filadelfia<br>Servicio De Referencia E<br>Informacion Legal<br>One Reading Center<br>Filadelfia, Pennsylvania  19107<br>(215) 238-6333<br>TTY (215) 451-6197** |

**10-284**



*Filed and Attested by the
Office of Judicial Records
23 JAN 2023 10:44 am
S. RICE*

## **VERIFICATION**

I, Johnathon Mohr, hereby state:

1.      I am a plaintiff in this action;

2.      I verify that the statements made in the foregoing Complaint are true and correct

to the best of my knowledge, information, and belief; and

3.      I understand that the statements in said Complaint are subject to the penalties of

18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.



Johnathon Mohr (Jan 20, 2023 13:46 EST)

DATED:      January 20, 2023

# EXHIBIT 1B

**HOLLAND & KNIGHT, LLP**
By:  Hyun Yoon, Esquire
Attorney I.D. No. 323706
2929 Arch Street, Suite 800
Philadelphia, PA 19104
Phone:  (215) 252-9600
Email:  eric.yoon@hklaw.com

*Filed and Attested by the
Office of Judicial Records
13 FEB 2023 03:25 pm
G. IMPERATO*

*Attorney for Defendant, The Trustees of the
University of Pennsylvania*

| | |
|---|---|
| JOHNATHON MOHR, for himself and other similarly situated, | : |
| Plaintiff, | : **COURT OF COMMON PLEAS** |
| | : **PHILADELPHIA COUNTY,** |
| vs. | : **PENNSYLVANIA** |
| | : |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, | : No. 230102149 |
| Defendant. | : |

## ENTRY OF APPEARANCE

TO THE PROTHONOTARY:

　　　　Kindly enter the appearance of Hyun Yoon, Esquire, PA Attorney I.D. No. 323706, on

behalf of Defendant, The Trustees of the University of Pennsylvania, with regard to the above-

captioned action.

　　　　　　　　　　　　　　　　　　　Respectfully submitted,

Dated:  February 13, 2023　　　　　　　　*/s/ Hyun Yoon*
　　　　　　　　　　　　　　　　　　　Hyun Yoon (PA I.D. 323706)
　　　　　　　　　　　　　　　　　　　**HOLLAND & KNIGHT LLP**
　　　　　　　　　　　　　　　　　　　2929 Arch Street, Suite 800
　　　　　　　　　　　　　　　　　　　Philadelphia, PA 19104
　　　　　　　　　　　　　　　　　　　Phone:  (215) 252-9600
　　　　　　　　　　　　　　　　　　　Email:  eric.yoon@hklaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of February, 2023, the foregoing Entry of Appearance was filed via the Court's electronic filing system, which serves a copy on all counsel of record.

*/s/ Hyun Yoon*
Hyun Yoon

Case ID: 230102149

# EXHIBIT 1C

**HOLLAND & KNIGHT, LLP**
By:  Hyun Yoon, Esquire
Attorney I.D. No. 323706
2929 Arch Street, Suite 800
Philadelphia, PA 19104
Phone:  (215) 252-9600
Email:  eric.yoon@hklaw.com

*Filed and Attested by the*
*Office of Judicial Records*
*13 FEB 2023 04:48 pm*
*I. LOWELL*

*Attorney for Defendant, The Trustees of the*
*University of Pennsylvania*

| | |
|---|---|
| JOHNATHON MOHR, for himself and other similarly situated, | : : : |
| Plaintiff, | : : **COURT OF COMMON PLEAS** |
| | : **PHILADELPHIA COUNTY,** |
| | : **PENNSYLVANIA** |
| vs. | : : |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, | : No. 230102149 : |
| | : : |
| Defendant. | : : |

## STIPULATION FOR EXTENSION OF TIME

It is hereby **STIPULATED** and **AGREED** by and between counsel for Plaintiff, Johnathon

Mohr, and counsel for Defendant, The Trustees of the University of Pennsylvania, that the time

within which Defendant may answer or otherwise respond to Plaintiff's Complaint is hereby

extended for 30 days, up to and including March 17, 2023.

Case ID: 230102149

/s/ Steven A. Schwartz
Steven A. Schwartz (PA I.D. 50579)
**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH LLP**
361 W. Lancaster Avenue
Haverford, PA 19041

Joshua D. Arisohn*
**BURSOR & FISHER, P.A.**
Joshua D. Arisohn*
Philip L. Fraietta*
888 Seventh Avenue
New York, NY 10019
*Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiff*

Date: February 13, 2023

/s/ Hyun Yoon
Mark S. Melodia (PA I.D. 53515)
Hyun Yoon (PA I.D. 323706)
Paul Bond*
**HOLLAND & KNIGHT LLP**
Cira Centre
2929 Arch Street, Suite 800
Philadelphia, PA 19104
*Pro Hac Vice Application Forthcoming*

*Counsel for Defendant*

Date:  February 13, 2023

2

Case ID: 230102149

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of February, 2023, the foregoing Stipulation for Extension of Time was filed with the Court's electronic filing system, which will serve a copy on all parties of record.

*/s/ Hyun Yoon*
Hyun Yoon

3

Case ID: 230102149

# EXHIBIT 1D

**HOLLAND & KNIGHT, LLP**
By:  Mark S. Melodia, Esq.
Attorney I.D. No. 53515
2929 Arch Street, Suite 800
Philadelphia, PA 19104
Phone:  (215) 252-9600
Email:  mark.melodia@hklaw.com

*Filed and Attested by the
Office of Judicial Records
15 FEB 2023 11:03 am
G. IMPERATO*

*Attorney for Defendant, The Trustees of the
University of Pennsylvania*

|  |  |
|---|---|
| JOHNATHON MOHR, for himself and other similarly situated, | : : : : |
| Plaintiff, | : **COURT OF COMMON PLEAS** |
| | : **PHILADELPHIA COUNTY,** |
| | : **PENNSYLVANIA** |
| vs. | : : |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, | : No. 230102149 : |
| | : |
| Defendant. | : : |

## ENTRY OF APPEARANCE

TO THE PROTHONOTARY:

        Kindly enter the appearance of Mark S. Melodia, Esquire, PA Attorney I.D. No. 53515, on

behalf of Defendant, The Trustees of the University of Pennsylvania, with regard to the above-

captioned action.

                                        Respectfully submitted,

Dated:  February 13, 2023                 */s/ Mark S. Melodia*
                                        Mark S. Melodia (PA I.D. 53515)
                                        **HOLLAND & KNIGHT LLP**
                                        2929 Arch Street, Suite 800
                                        Philadelphia, PA 19104
                                        Phone:  (215) 252-9600
                                        Email:  mark.melodia@hklaw.com

                                        *Attorney for Defendant, The Trustees of the
                                        University of Pennsylvania*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 13th day of February, 2023, the foregoing Entry of Appearance

was filed via the Court's electronic filing system, which serves a copy on all counsel of record.

<u>*/s/ Mark S. Melodia*            </u>
Mark S. Melodia

2

Case ID: 230102149

# EXHIBIT 1E



 hyoon

Civil Docket Report

A $5 Convenience fee will be added to the transaction at checkout.

## Case Description

| | |
|---|---|
| **Case ID:** | 230102149 |
| **Case Caption:** | MOHR VS THE TRUSTEES OF THE UNIVERSITY OF PENNSYLV |
| **Filing Date:** | Monday , January 23rd, 2023 |
| **Court:** | MAJOR JURY-EXPEDITED |
| **Location:** | CITY HALL |
| **Jury:** | JURY |
| **Case Type:** | WRONGFUL USE OF CIVIL PROCESS |
| **Status:** | WAITING TO LIST CASE MGMT CONF |

## Related Cases

*No related cases were found.*

## Case Event Schedule

*No case events were found.*

## Case motions

*No case motions were found.*

## Case Parties

| Seq # | Assoc | Expn Date | Type | Name |
|---|---|---|---|---|
| 1 | | | ATTORNEY FOR PLAINTIFF | SCHWARTZ, STEVEN A |
| **Address:** | 361 WEST LANCASTER AVE<br>ONE HAVERFORD CENTRE<br>HAVERFORD PA 19041<br>(610)642-8500<br>sas@chimicles.com | **Aliases:** | *none* | |
| | | | | |
| 2 | 1 | | PLAINTIFF | MOHR, JOHNATHON |
| **Address:** | 2122 CAROL LANE<br>EAST NORRITON PA 19401 | **Aliases:** | *none* | |
| | | | | |

| 3 | | 5 | | DEFENDANT | TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA |
|---|---|---|---|---|---|
| **Address:** | 801 SPRUCE STREET PHILADELPHIA PA 19107 | | **Aliases:** | *none* | |
| | | | | | |
| 4 | | | | TEAM LEADER | ANDERS, DANIEL J |
| **Address:** | 529 CITY HALL PHILADELPHIA PA 19107 | | **Aliases:** | *none* | |
| | | | | | |
| 5 | | | | ATTORNEY FOR DEFENDANT | YOON, HYUN |
| **Address:** | CIRE CENTRE 2929 ARCH ST SUITE 800 PHILADELPHIA PA 19102 (215)252-9537 eric.yoon@hklaw.com | | **Aliases:** | *none* | |
| | | | | | |
| 6 | | 5 | | ATTORNEY FOR DEFENDANT | MELODIA, MARK S |
| **Address:** | 31 WEST 52ND STREET NEW YORK NY 10019 (212)513-3583 mark.melodia@hklaw.com | | **Aliases:** | *none* | |

## Docket Entries

| Filing Date/Time | Docket Type | Filing Party | Disposition Amount |
|---|---|---|---|
| 23-JAN-2023 10:44 AM | ACTIVE CASE | | |
| **Docket Entry:** | E-Filing Number: 2301043648 | | |
| | | | |
| 23-JAN-2023 10:44 AM | COMMENCEMENT CIVIL ACTION JURY | SCHWARTZ, STEVEN A | |
| **Documents:** | [Final Cover](#) | | |
| **Docket Entry:** | *none.* | | |
| | | | |

| 23-JAN-2023 10:44 AM | COMPLAINT FILED NOTICE GIVEN | SCHWARTZ, STEVEN A | |
|---|---|---|---|
| **Documents:** | 2023.01.20 FINAL State Ct UPenn Complaint.docx - Read-Only.pdf<br>2023.01.19 Notice to Defend.pdf<br>Mohr Verification pg. 1 for KLW.pdf | | |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 FILED. | | |
| | | | |
| 23-JAN-2023 10:44 AM | JURY TRIAL PERFECTED | SCHWARTZ, STEVEN A | |
| **Docket Entry:** | 8 JURORS REQUESTED. | | |
| | | | |
| 23-JAN-2023 10:44 AM | WAITING TO LIST CASE MGMT CONF | SCHWARTZ, STEVEN A | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 13-FEB-2023 03:25 PM | ENTRY OF APPEARANCE | YOON, HYUN | |
| **Documents:** | H. Yoon Entry of Appearance for Defendant.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF HYUN YOON FILED. (FILED ON BEHALF OF TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA) | | |
| | | | |
| 13-FEB-2023 04:48 PM | STIPULATION FILED | YOON, HYUN | |
| **Documents:** | Stipulation for Extension of Time.pdf | | |
| **Docket Entry:** | STIPULATION TO EXTEND TIME TO RESPOND OR OTHERWISE PLEAD TO COMPLAINT FILED. (FILED ON BEHALF OF TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA) | | |
| | | | |
| 15-FEB-2023 11:03 AM | ENTRY OF APPEARANCE-CO COUNSEL | MELODIA, MARK S | |
| **Documents:** | Entry of Appearance of Mark Melodia for Defendant.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF MARK S MELODIA AS CO-COUNSEL FILED. (FILED ON BEHALF OF TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA) | | |

Case Description     Related Cases     Event Schedule     Case Parties     Docket Entries

E-Filing System     Search Home

# EXHIBIT 2

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

| | For Prothonotary Use Only (Docket Number) |
|---|---|
| **JANUARY 2023** | **002149** |
| E-Filing Number: 2301043648 | |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| JOHNATHON MOHR | THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 2122 CAROL LANE<br>EAST NORRITON PA 19401 | 801 SPRUCE STREET<br>PHILADELPHIA PA 19107 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION | |
|---|---|---|---|
| 1 | 1 | ☒ Complaint   ☐ Petition Action   ☐ Notice of Appeal<br>☐ Writ of Summons   ☐ Transfer From Other Jurisdictions | |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less<br>☒ More than $50,000.00 | ☐ Arbitration<br>☒ Jury<br>☐ Non-Jury<br>☐ Other: | ☐ Mass Tort<br>☐ Savings Action<br>☐ Petition | ☐ Commerce<br>☐ Minor Court Appeal<br>☐ Statutory Appeals | ☐ Settlement<br>☐ Minors<br>☐ W/D/Survival |

**CASE TYPE AND CODE**

2E - WRONGFUL USE OF CIVIL PROCESS

*CK 1-26-23*
*NN*

**STATUTORY BASIS FOR CAUSE OF ACTION**

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | **FILED**<br>**PRO PROTHY**<br><br>JAN **23** 2023<br><br>**S. RICE** | IS CASE SUBJECT TO<br>COORDINATION ORDER?<br>YES        NO |
|---|---|---|

**TO THE PROTHONOTARY:**

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: <u>JOHNATHON MOHR</u>

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| STEVEN A. SCHWARTZ | 361 WEST LANCASTER AVE<br>ONE HAVERFORD CENTRE<br>HAVERFORD PA 19041 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (610)642-8500 | (610)649-3633 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 50579 | sas@chimicles.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| *STEVEN SCHWARTZ* | Monday, January 23, 2023, 10:44 am |

FINAL COPY (Approved by the Prothonotary Clerk)

## First Judicial District of Pennsylvania
## Court of Common Pleas of Philadelphia

*Filed and Attested by the Office of Judicial Records
23 JAN 2023 10:44 am
S. RICE*

JOHNATHON MOHR, for himself and others similarly situated,

Plaintiff,

v.

THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,

Defendant.

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| **You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.** | **Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.** |
| *You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.* | *Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.* |
| Philadelphia Bar Association<br>Lawyer Referral<br>and Information Service<br>One Reading Center<br>Philadelphia, Pennsylvania 19107<br>(215) 238-6333<br>TTY (215) 451-6197 | Asociacion De Licenciados<br>De Filadelfia<br>Servicio De Referencia E<br>Informacion Legal<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>(215) 238-6333<br>TTY (215) 451-6197 |

10-284

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY,
PENNSYLVANIA

Filed and Attested by the
Office of Judicial Records
23 JAN 2023 10:44 am
S. RICE

| | |
|---|---|
| JOHNATHON MOHR, for himself and others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,<br><br>      Defendant. | CIVIL DIVISION<br><br>Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Johnathon Mohr ("Plaintiff"), on behalf of himself and all other similarly situated individuals (the "Class Members") against The Trustees of the University of Pennsylvania ("Defendant") which operates, controls and manages the Hospital of the University of Pennsylvania Health System ("Penn Medicine") brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

### NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all Pennsylvania residents who have accessed and used the myPennMedicine app (the "App") or any of the following websites that Defendant owns and operates: pennmedicine.org; pennbehavioralhealth.org; and/or uphs.upenn.edu.

1

Case ID: 230102149

2.      Defendant aids employs, agrees, and conspires with Facebook/Meta[1] to intercept communications sent and received by Plaintiff and Class Members, including communications containing protected medical information.   Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this action pursuant to Pa. Cons. Art. 5, §5(b) and 42 Pa. C.S.A. § 931(b).

4.      The Court has personal jurisdiction over Defendant pursuant to 42 Pa. C.S.A. 5301(a)(2).

5.      Venue is proper pursuant to Pa. R. Civ. P. 2179(a)(1) because Defendant's principal place of business is located in this County

## THE PARTIES

### *Plaintiff Mohr*

6.      Plaintiff Johnathon Mohr is an adult citizen of the Commonwealth and is domiciled in Norristown, Pennsylvania.

7.      From 2020 to 2022, Plaintiff Mohr used the pennmedicine.org website and patient portal to schedule an appointment and access medical results.   Plaintiff Mohr accessed the website using a tablet and desktop computer. As described below, each time Plaintiff Mohr booked medical appointments, he disclosed medical information regarding his medical condition, history or treatment.

---

[1] In October 2021, Facebook, Inc. changed its name to Meta, Inc.   Unless otherwise indicated, Facebook, Inc. and Meta, Inc. are referenced collectively herein as "Facebook."

2

8.     Plaintiff Mohr also has an active Facebook account which he has maintained since 2020.  Plaintiff Mohr accesses his Facebook account from multiple devices, including his tablet, smartphone and desktop computer.

***Defendant***

9.     Defendant The Trustees of the University of Pennsylvania is a registered nonprofit entity with its principal place of business in Pennsylvania.  Defendant employs approximately 20,433 individuals.  As of June 2021, Defendant reported revenue of approximately $9.3 billion and total assets of approximately $31 billion.  Through Penn Medicine, Defendant offers a full range of medical services, including primary, inpatient and outpatient care, and treats thousands of patients each year.

10.     Pursuant to the systematic process described herein, Defendant, through Penn Medicine, assisted Facebook with intercepting Plaintiff's communications, including those that contained personally identifiable information, protected health information and related confidential information.  Defendant assisted these interceptions without Plaintiff's knowledge, consent or express written authorization.

11.     By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected health information.

## FACTUAL ALLEGATIONS

***The Pennsylvania Wiretapping and Electronic Surveillance Control Act***

12.     The Pennsylvania Wiretapping and Electronic Surveillance Control Act (the "Pennsylvania Wiretapping Act") prohibits: (a) the interception or procurement of another to intercept any wire, electronic or oral communication; (b) the intentional disclosure of the contents

3

of any wire, electronic or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic or oral communication; and (c) the intentional use of the contents of any wire, electronic or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic or oral communication. 18 Pa. Cons. Stat. § 5703.

13.    Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose or use, a wire, electronic, or oral communication in violation of the Pennsylvania Wiretapping Act is subject to a civil action for: (a) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

14.    Under the Pennsylvania Wiretapping Act, "intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

15.    Under the Pennsylvania Wiretapping Act, "contents" is defined as "used with respect to any wire, electronic or oral communication, is any information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. § 5702.

16.    Under the Pennsylvania Wiretapping Act, "person" is defined as "any individual, partnership, association, joint stock company, trust or corporation." 18 Pa. Cons. Stat. § 5702.

17.    Under the Pennsylvania Wiretapping Act, "electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. § 5702.

4

Case ID: 230102149

18.     Pursuant to the Pennsylvania Wiretapping Act, the Commonwealth and any of its officers, officials or employees who may be shielded from liability under the Pennsylvania Wiretapping Act by the doctrine of sovereign immunity waive such immunity.  18 Pa. Const. Stat. § 5725(b).

**Penn Medicine and Its Website**

19.     Penn Medicine has six acute care hospitals, eight multispecialty centers and hundreds of outpatient locations within the Commonwealth.  In fiscal year 2021, Penn Medicine had: (a) approximately 6.5 million outpatient visits; (b) over 337,000 emergency department visits; and (c) over 3,400 hospital beds.

20.     Penn Medicine offers a full range of medical services, including primary, inpatient and outpatient care.

21.     Penn Medicine has three websites – pennmedicine.org; pennbehavioralhealth.org; and uphs.upenn.edu – that are accessible on mobile devices and desktop computers.  Penn Med also offers the App for download on Android and iPhone devices.

**Facebook's Platform and Business Tools**

22.     Facebook describes itself as a "real identity platform,"[2] meaning users are allowed only one account and must share "the name they go by in everyday life."[3]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[4]

---

[2] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[3] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[4] FACEBOOK, SIGN UP, https://www.facebook.com/

Case ID: 230102149

23.     In 2021, Facebook generated $117 billion in revenue.[5]  Roughly 97% of that came from selling advertising space.[6]

24.     Facebook sells advertising space by highlighting its ability to target users.[7] Facebook can target users so effectively because it surveils user activity both on and off its site.[8] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[9]  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

25.     Advertisers can also build "Custom Audiences."[11]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12]  With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from

---

[5] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx
[6] Id.
[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[8] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.
[10] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.
[11] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[12] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

Case ID: 230102149

your source audience to find new people who share similar qualities."[13]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  Advertisers can do so through two mechanisms: (a) by manually uploading contact information for customers; or (b) by utilizing Facebook's "Business Tools."[14]

26.     As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[15]  Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

27.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, the webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[16]  Facebook's Business Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers

---

[13] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494;
FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[15] FACEBOOK, THE FACEBOOK BUSINESS TOOLS,
https://www.facebook.com/help/331509497253087.
[16] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED,
https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST
PRACTICES FOR FACEBOOK PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142;
FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

Case ID: 230102149

can choose, including what content a visitor views or purchases.[17]  Advertisers can even create their own tracking parameters by building a "custom event."[18]

28.      One such Business Tool is the Facebook Tracking Pixel.  Facebook offers this piece of code to advertisers, like Defendant, to integrate into their websites.  As the name implies, the Facebook Tracking Pixel "tracks the people and type of actions they take."[19]  When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software script surreptitiously directs the user's browser to send a separate message to Facebook's servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Facebook Tracking Pixel is configured to collect.  This transmission is initiated by Facebook code and concurrent with the communications with the host website.  Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's websites— Defendant's own code and Facebook's embedded code.

29.      An example illustrates the point.  Take an individual who navigates to one of Defendant's websites and clicks on a tab for allergy information.  When that tab is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.  Because Defendant utilizes the Facebook Tracking Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening.  Facebook causes the browser to secretly and concurrently duplicate the communication with the Penn Medicine website at issue, transmitting

---

[17] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791465561655?id=1205376682832142.
[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142; see also
FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.
[19] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

Case ID: 230102149

it to Facebook's servers, alongside additional information that transcribes the communication's content and the individual's identity.

30.    After collecting and intercepting this information, Facebook processes it, analyzes it and assimilates it into datasets like Core Audiences and Custom Audiences.

**How Defendant Discloses Plaintiff's and Class Members' Protected Health Information and Assists with Intercepting Communications**

31.    Through the Facebook Tracking Pixel, Defendant – via Penn Medicine's websites – shares Penn Medicine's patients' identities and online activity, including information and search results related to their private medical treatment.

32.    An investigation by *The Markup* revealed that thirty-three of the top 100 hospitals in the United States, as ranked by *Newsweek*, have the Facebook Tracking Pixel embedded on the appointment schedule pages of their websites, among other possible places.[20]  Penn Medicine is one of the identified websites.[21]

33.    According to the Markup Investigation, the hospital websites are "collecting patients' sensitive health information – including details about their medical conditions, prescriptions, and doctor's appointments – and sending it to Facebook."[22]

34.    The Markup Investigation further revealed that the data sent to Facebook is connected to: (a) the IP address of the computer sending the information, providing Facebook with the ability to connect the sensitive information to specific individual or household; or, worse: (b)

---

[20] Todd Feathers, *et al.*, FACEBOOK IS RECEIVING SENSITIVE MEDICAL INFORMATION FROM HOSPITAL WEBSITES, THE MARKUP ("Markup Investigation") (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.
[21] *Id.*
[22] *Id.*

Case ID: 230102149

a specific Facebook user if the user is logged into their Facebook account when using the websites at issue.[23]

35.     The Markup Investigation provided the following examples of the types of information surreptitiously intercepted by Facebook: (a) "clicking the 'Schedule Online' button on a doctor's page [of a specified hospital] prompted the [Facebook Tracking Pixel] to send Facebook the text of the button, the doctor's name, and the search term we used to find her: 'pregnancy termination'"; and (b) clicking the "Schedule Online Now' button on a different website "prompted the [Facebook Tracking Pixel] to send Facebook the text of the button, the doctor's name, and the condition we selected from the dropdown menu: "Alzheimer's."[24]

36.     The startling information revealed in the Markup Investigation prompted a former senior privacy advisor for the U.S. Department of Health and Human Services' Office for Civil Rights ("Office for Civil Rights") to remark on the troubling nature of the conduct: "I am deeply troubled by what [the hospitals] are doing with the capture of [patients'] data and the sharing of it."[25]

***How Penn Medicine Discloses Protected Health Information***

37.     Penn Medicine allows patients to select options like "Find a Doctor," "Find a Location," "Make an Appointment," and "Pay Your Bill."

---

[23] *Id.*
[24] *Id.*
[25] *Id.*

Case ID: 230102149



When patients click "Find a Doctor," they can search by "[c]ondition, treatment, specialty, or name."



11

39.     When patients click "Make an Appointment," they can click on an option to schedule an appointment through the "myPennMedicine" portal.



40.     Upon information and belief, whenever patients search their treatment or condition, or whenever patients schedule an appointment, Defendant procures Facebook to intercept communications that contain protected health information.

41.     Each time Defendant sends this content, it also discloses a patient's personally identifiable information, including their Facebook ID ("FID"). An FID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. Notably, while Facebook can easily identify any individual on its own Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, to find a corresponding profile, a person need only attach the FID to the end of the URL for Facebook, typing in Facebook.com/[FID].

Case ID: 230102149

42.     A user who accesses Defendant's website while logged into Facebook will transmit what is known as the "c_user cookie" to Facebook, which contains that user's unencrypted Facebook ID.

43.     When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies.

44.     One such cookie is the "fr cookie" which contains, at least, an unencrypted Facebook ID and browser identifier.  Facebook, at a minimum, uses the fr cookie to identify users.[26]

45.     If a visitor has never created an account, an even small set of cookies are transmitted.

46.     At each stage, Defendant also utilizes the "_fbp cookie," which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user.[27]

47.     The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[28]  If that happens, the time resets, and another 90 days begins to accrue.[29]

48.     The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[30]  If that happens, the time rests, and another 90 days begins to accrue.[31]

---

[26] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES,
https://www.facebook.com/policy/cookies/.
[27] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES,
https://www.facebook.com/policy/cookies/.
[28] See FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES,
https://www.facebook.com/policy/cookies/.
[29] Confirmable through developer tools.
[30] See FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES,
https://www.facebook.com/policy/cookies/.
[31] Also confirmable through developer tools.

Case ID: 230102149

49.     The Facebook Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Penn Medicine.[32]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[33]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

50.     Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.  Defendant sends these identifiers alongside the event data.

51.     Plaintiff never consented, agreed, or otherwise permitted Penn Medicine to disclose his personally identifiable information and protected health information.  Plaintiff was never provided with any written notice that Defendant disclosed his users' protected health information, nor was he provided any means of opting out of such disclosures.  Defendant nonetheless knowingly disclosed Plaintiff's protected health information to Facebook.

52.     By law, Plaintiff is entitled to privacy in his protected health information and confidential communications.  Defendant deprived Plaintiff of his privacy rights by procuring Facebook to intercept these communications by implementing a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and other patients' confidential communications, personally identifiable information, and protected health information.  Plaintiff did not discover

---

[32] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[33] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

14

that Defendant disclosed his personally identifiable information and protected health information

to Facebook, and assisted Facebook with intercepting his communications, until January 2023.

. **The Expectation of Privacy in Healthcare Information**

53.     An individual's medical records and information are among the most sensitive type

of personal information.

54.     Indeed, the Commonwealth requires that medical records be treated as confidential.

28 Pa. Code § 115.27.

55.     Similarly, the Health Insurance Portability and Accountability Act of 1996

("HIPPA") imposes strict standards to protect sensitive patient health information from being

disclosed without the patients' knowledge and consent.  *See* 45 C.F.R. § 160, *et seq.*

56.     On December 1, 2022, the Office for Civil Rights issued a bulletin titled *Use of*

*Online Tracking Technologies by HIPPA Covered Entities and Business Associates* (the

"Bulletin") in which it addressed the impropriety of healthcare providers utilizing tracking

technologies such as the Facebook Tracking Pixel in a manner that impermissibly discloses

protected health information ("PHI") in violation of the HIPPA.[34]

57.     According to the Office for Civil Rights, "[r]egulated entities [those to which

HIPPA applies] are not permitted to use tracking technologies in a manner that would result

in impermissible disclosures of [protected health information] to tracking technology

vendors or any other violations of the HIPPA Rules."[35]  As set forth in the Bulletin, "disclosures

---

[34] U.S. Dep't of Health and Human Services – Office for Civil Rights, Use of Online Tracking
Technologies by HIPPA Covered Entities and Business Associates (Dec. 1, 2022),
https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.
[35] *Id.* (emphasis in original).

Case ID: 230102149

of PHI to tracking technology vendors for marketing purposes, without individuals' HIPPA-compliant authorizations, would constitute impermissible disclosures."[36]

58.     Outside of HIPPA, the Office for Civil Rights warned that an impermissible disclosure of an individual's PHI could result in a wide range of additional harms to the individual or others.[37] "For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or others identified in the individual's PHI."[38]

59.     The Office for Civil Rights noted the broad range of information that constitutes PHI, including "individually identifiable health information" ("IIHI") such as "an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code."[39] According to the Bulletin, IIHI can constitute PHI because:

> when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (*i.e.*, it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[40]

60.     The Office for Civil Rights concluded that "it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPPA Privacy Rule."[41]

---

[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.* (emphasis in original).

Case ID: 230102149

61.     As a result of Defendant's conduct, as alleged herein, Plaintiff and Class Members have been exposed to the harms and impending harms described in the Bulletin.

62.     Moreover, "courts have recognized the 'growing trend across courts . . . to recognize the lost property value' of personal information. *In re Marriott Int'l, Inc., Cust. Data Sec. Breach Litig.*, 440 F.Supp.3d 447, 461 (D. Md. 2020) . . .; *see also In re Facebook Privacy Litigation*, 557 F.App'x. 494, 494 [sic] (9th Cir. 2014)." *Calhoun v. Google LLC*, 526 F.Supp.3d 605, 636 (N.D. Cal. 2021).

## CLASS ACTION ALLEGATIONS

63.     Plaintiff, pursuant to Rules 1702, 1708 and 1709 of the Pennsylvania Rules of Civil Procedure, asserts this action individually and on behalf of the following Class: All natural persons in the Commonwealth of Pennsylvania whose personal information was collected through the Facebook Tracking Pixel.

64.     Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division and/or to add subclasses after having had an opportunity to conduct discovery.

65.     Excluded from the Class are: (a) Defendant; (b) any parent, affiliate or subsidiary of Defendant; (c) any entity in which Defendant has a controlling interest; (d) any of Defendant's officers or directors; (e) any successor or assign of Defendant; (f) any judge or court personnel assigned to this case and members of their immediate families; and (g) Plaintiff's counsel and Defendant's counsel and anyone employed by them.

66.     **Numerosity.**  Consistent with Pennsylvania Rule of Civil Procedure 1702(1), the Class is so numerous that joinder of all members is impracticable.  While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the Class contains at least hundreds

17

Case ID: 230102149

of thousands of individuals, and the members can be identified through Defendant's records.  Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media and/or published notice.

67.      **Commonality.**  Consistent with Pennsylvania Rule of Civil Procedure 1702(2), common questions of law and fact exist as to all Class Members.  These common questions of law or fact predominate over any questions affecting only individual members of the Class.  Common questions include, but are not limited to the following:

a.   Whether Plaintiff and Class Members had a reasonable expectation of privacy in their sensitive health information communicated to their healthcare providers;

b.   Whether Defendant violated Plaintiff's and Class Members' privacy rights;

c.   Whether Defendant intentionally tapped the lines of internet communication between Plaintiff and Class Members and their medical providers;

d.   Whether Penn Medicine's websites surreptitiously record personally identifiable information, protected health information and related communications and simultaneously, or subsequently, discloses that information to Facebook.

e.   Whether Facebook is a third-party eavesdropper;

f.   Whether Defendant's disclosure of personally identifiable information, protected health information and related communications constitutes an affirmative act of communication;

g.   Whether Defendant's actions violated the Pennsylvania Wiretapping Act; and

h.   Whether Plaintiff's and Class Members are entitled to damages under the Pennsylvania Wiretapping Act.

Case ID: 230102149

68.   **Typicality.**   Consistent with Pennsylvania Rule of Civil Procedure 1702(3), Plaintiff's claims are typical of the claims of the Class he seeks to represent because Plaintiff and all Class Members have suffered similar injuries as a result of the same practices alleged herein. Plaintiff has no interests to advance adverse to the interests of the other Class Members, and Defendant has no defenses unique to any Plaintiff.

69.   **Adequate Representation.**   Consistent with Pennsylvania Rule of Civil Procedure 1702(4) and 1709, Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class and has retained as his counsel attorneys competent and experienced in class actions and complex litigation, including litigation to remedy privacy violations. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of Class Members, and they have the resources to do so.

70.   **Predominance.**   Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(1), common questions of law and fact predominate over any questions affecting only individual class members. For example, Defendant's liability and the fact of damages is common to all members of the Class.

71.   **Superiority and Manageability.**   Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(2), a class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class Member, while meaningful on an individual basis, may not be of such magnitude as to make the prosecution of individual actions against Defendant economically feasible. Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system. Moreover, individual litigation of the legal and factual issues of the case would increase the delay and expense to all parties and the court system. A class action, however, presents far fewer management difficulties

Case ID: 230102149

and provides the benefit of single adjudication, economy of scale and comprehensive supervision by a single court.

72.    **Risk of Inconsistent, Varying, or Prejudicial Adjudications.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(3), a class action will minimize the risk of inconsistent, varying or prejudicial adjudications.  If Plaintiff's and Class members' claims were tried separately, Defendant would be confronted with incompatible standards of conduct and divergent court decisions.

73.    **Litigation Already Commenced.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(4), to Plaintiff's knowledge, there are no other cases that have been brought against Defendant, or that are currently pending against Defendant, where Pennsylvania consumers seek to represent a class of Pennsylvania residents based on conduct alleged in this Complaint.

74.    **Appropriateness of Forum.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(5), the most appropriate forum to concentrate the litigation is this County because Defendant is headquartered in this County and a substantial number of Class members were injured in this County.

75.    **Support for Class Certification.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(6) and (7), there is support for a class to be certified because of the relatively low amount recoverable by each Class member and the expenses of individual litigation.

76.    **The General Applicability of Defendant's Conduct.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(b)(2), Defendant's conduct is generally applicable to the class as a whole, making relief appropriate with respect to each Class member.

CLAIMS FOR RELIEF

COUNT I
Violation of the Pennsylvania Wiretapping Act
18 Pa. Cons. Stat. § 5701, *et seq.*

77.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

78.     Plaintiff brings this Count individually and on behalf of the members of the Class.

79.     The Pennsylvania Wiretapping Act prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

80.     Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

81.     At all relevant times, Defendant procured Facebook to track and intercept Plaintiff's and Class members' internet communications while navigating the App or any of the following websites that Defendant owns and operates: pennmedicine.org; pennbehavioralhealth.org; and/or uphs.upenn.edu.   They intercepted these communications without authorization and consent from Plaintiff and Class members.

82.     Defendant, when procuring Facebook to intercept Plaintiff's communications, intended Facebook to learn the meaning of the content the visitor requested.

83.     Plaintiff and Class members had a justified expectation under the circumstances that their electronic communications would not be intercepted.

84.     Plaintiff and Class members were not aware that their electronic communications were being intercepted by Facebook.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.     Determining that this action is a proper class action;

b.     For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

c.     For an order declaring that Defendant's conduct violates the statute referenced herein;

d.     For an order finding in favor of Plaintiff and the Class on the count asserted herein;

e.     Award compensatory damages, including statutory damages where available, to Plaintiff and the Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f.     For punitive damages, as warranted, in an amount to be determined at trial;

g.     Ordering Defendant to disgorge revenues and profits wrongfully obtained;

h.     For prejudgment interest on all amounts awarded;

i.     For injunctive relief as pleaded or as the Court may deem proper;

j.     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

k.      Grant Plaintiff and the Class members such further relief as the Court deems

appropriate.

JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.


Dated:  January 23, 2023                    Respectfully submitted,

                                            By:   _Steven A. Schwartz_
                                            CHIMICLES SCHWARTZ KRINER
                                              & DONALDSON-SMITH LLP
                                            Steven A. Schwartz (PA I.D. No. 50579)
                                            361 W. Lancaster Avenue
                                            Haverford, PA  19041
                                            Tel: (610) 642-8500
                                            Fax: (610) 649-3633
                                            E-Mail: sas@chimicles.com

                                            BURSOR & FISHER, P.A.
                                            Joshua D. Arisohn*
                                            Philip L. Fraietta*
                                            888 Seventh Avenue
                                            New York, NY 10019
                                            Tel: (646) 837-7150
                                            Fax: (212) 989-9163
                                            E-Mail: jarisohn@bursor.com
                                                    pfraietta@bursor.com

                                            BURSOR & FISHER, P.A.
                                            Christopher R. Reilly*
                                            701 Brickell Ave., Suite 1420
                                            Miami, FL 33131-2800
                                            Telephone: (305) 330-5512
                                            Facsimile: (305) 676-9006
                                            E-Mail: creilly@bursor.com

                                            DRURY LEGAL, LLC
                                            Scott R. Drury*
                                            6 Carriage Lane
                                            Highwood, Illinois 60040
                                            Telephone: (312) 358-8225
                                            E-Mail: scott@drurylegal.com

                                            *Pro Hac Vice Application Forthcoming

                                            Attorneys for Plaintiff and the Putative Class

23

*Filed and Attested by the
Office of Judicial Records
23 JAN 2023 10:44 am
S. RICE*

VERIFICATION

I, Johnathon Mohr, hereby state:

1.      I am a plaintiff in this action;

2.      I verify that the statements made in the foregoing Complaint are true and correct

to the best of my knowledge, information, and belief; and

3.      I understand that the statements in said Complaint are subject to the penalties of

18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

DATED:      January 20, 2023

Case ID: 230102149

# EXHIBIT 3

 Caution
As of: February 22, 2023 3:36 PM Z

## *Doe v. UPMC*

United States District Court for the Western District of Pennsylvania

July 31, 2020, Decided; July 31, 2020, Filed

2:20-cv-359

**Reporter**

2020 U.S. Dist. LEXIS 136077 *; 2020 WL 4381675

JANE DOE I and JANE DOE II, on behalf of themselves and all others similarly situated, Plaintiffs, vs. UPMC, Defendant.

**Subsequent History:** Motion denied by *Doe v. UPMC, 2020 U.S. Dist. LEXIS 176222 (W.D. Pa., Sept. 25, 2020)*

## Core Terms

UPMC, federal official, removal, patient, removal statute, Plaintiffs', colorable, federal court, notice, portal, federal government, website, private entity, allegations, preemption, technology, health information, state court, Coordinator, healthcare, federal law, quotations, regulation, providers, parties, entity, complained-of, defenses, purposes, federal office

**Counsel:   [*1]** For JANE DOE I, JANE DOE II, on behalf of themselves and all others similarly situated, Plaintiffs: James C Shah, LEAD ATTORNEY, Shepherd, Finkelman, Miller & Shah, LLP, Philadelphia, PA; Jason O Barnes, LEAD ATTORNEY, PRO HAC VICE, Simmons Hanly Conroy, New York, NY.

For UPMC, a Pennsylvania Nonprofit, Non-Stock Corporation, Defendant: Rebekah B. Kcehowski, LEAD ATTORNEY, Anderson T. Bailey, Leon F. DeJulius, Jones Day, Pittsburgh, PA.

**Judges:** Marilyn J. Horan, United States District Judge.

**Opinion by:** Marilyn J. Horan

## Opinion

**OPINION AND ORDER**

Plaintiffs, currently proceeding under pseudonyms,[1] filed the present class action against Defendant UPMC in the Court of Common Pleas of Allegheny County, Pennsylvania. (ECF No. 1-2). Plaintiffs seek redress under Pennsylvania law for UPMC's alleged disclosure of Plaintiffs' personally identifiable information to third parties for internet marketing purposes without Plaintiffs' knowledge or authorization. UPMC removed the matter to federal court, citing two bases: federal officer removal jurisdiction, under *28 U.S.C. § 1442(a)(1)*, and class action diversity jurisdiction, pursuant to the Class Action Fairness Act, at *28 U.S.C. § 1332(d)*. (ECF No. 1). Plaintiffs seek remand of the case back to state court. (ECF No. **[*2]** 11). In support of their Motion to Remand, Plaintiffs filed two additional Motions. The first asks the Court to allow discovery related to citizenship of the class members. (ECF No. 13). The second asks the Court to take judicial notice of certain Census information related to citizenship of the class members, as well as a letter from UPMC to the federal government. (ECF No. 15). The parties have briefed the issues, (ECF Nos. 12, 14, 16, 22, 24, 26, 27, 35), and the Court heard oral argument on the Motion to Remand. The Motions are now ripe for decision.

For the following reasons, the Motion to Remand will be denied, and both the Motion for Jurisdictional Discovery and the Request for Judicial Notice will be denied as moot.

**I. Background**

Plaintiffs bring this action individually and on behalf of a class of plaintiffs consisting of "[a]ll Pennsylvania

---

[1] Plaintiffs filed a Motion to Proceed Under Pseudonym along with their Complaint. (ECF No. 1-2, at 209). The parties have stipulated that said Motion should be decided by the court that ultimately addresses the merits of this case, that is, after this Court decides the Motion to Remand. (ECF No. 4).

2020 U.S. Dist. LEXIS 136077, *2

residents who are, or were, patients of UPMC or any of its affiliates, and who used UPMC's web properties, including, but not limited to, UPMC.com and the Patient Portal at myupmc.upmc.com." (ECF No. 1-2, at ¶ 367). According to the Complaint, UPMC "encourages patients to exchange communications" through its website and patient portal "to [*3] search for a doctor, learn more about their conditions and treatments, access medical records and test results, and make appointments." *Id.* at ¶ 5. Plaintiffs allege that UPMC then re-directs certain personally identifiable information and patient communication content from its website and patient portal to third parties, such Facebook and Google, for marketing purposes without patients' consent. *Id.* at ¶¶ 10-13. Plaintiffs contend that through this conduct, UPMC fails to uphold its obligations and promises to protect patients' privacy. *Id.* at ¶¶ 3, 6-11. Plaintiffs thus bring the following claims: in Count I, breach of provider-patient confidentiality; in Count II, violation of *Pennsylvania's Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S. § 5701 et seq.*; in Count III, violation of *Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 et seq.*; in Count IV, identity theft, in violation of *18 Pa.C.S. § 4120*; in Count V, negligence; and in Count VI, intrusion upon seclusion.

UPMC removed the matter to federal court primarily on the basis of the federal officer removal jurisdiction, found at *28 U.S.C. § 1442*. (ECF No. 1). In UPMC's Notice of Removal, UPMC states that when it engaged in the complained-of conduct, it was acting **[*4]** under the Department of Health and Human Services (DHHS), the Centers for Medicare and Medicaid Services (CMS), and the Office of the National Coordinator for Health Information Technology, to implement DHHS's voluntary electronic health records incentive program, known as the EHR Incentive Program or, more commonly, the Meaningful Use Program. *Id.* at ¶¶ 16-24. Through the Meaningful Use Program, the federal government makes incentive payments to healthcare providers who increase their use of, as well as patient engagement with, electronic health records, or "EHR." *Id.* at ¶ 14. This program came about as a result of the federal government's goal of a "'nationwide implementation of interoperable health information technology in both the public and private health care sectors.'" *Id.* at ¶ 18 (quoting Exec. Order 13,335, *69 Fed. Reg. 24,059 (Apr. 27, 2004)*). According to UPMC, Plaintiffs' claims "effectively ask[] a court to intervene in the operation of a federal program and hold that the federal government, UPMC, and most other healthcare systems are all violating state law." *Id.* at 1-2. As such, UPMC argues,

this matter belongs in federal court. *Id.* Plaintiffs disagree. (ECF Nos. 11, 12).

UPMC also contends that removal is proper under the Class Action Fairness Act (CAFA), **[*5]** at *28 U.S.C. § 1332(d)*, in that the amount in controversy exceeds $5,000,000 and minimal diversity exists. (ECF No. 1, at ¶ 66). In response, Plaintiffs argue that the "home state" exception to CAFA applies, which requires the Court to remand the matter to state court if more than two-thirds of the class are citizens of the same state as the primary defendant. (ECF No. 12, at 8). Plaintiffs ask that the Court take judicial notice of certain information and that they be allowed to engage in discovery related to the citizenship of the potential class, so that they may show that more than two-thirds of the class are citizens of Pennsylvania. (ECF No. 13, 15).

## II. Discussion

A defendant who faces a lawsuit in state court may remove that lawsuit to federal court when certain jurisdictional criteria are met. *28 U.S.C. §§ 1441-55*. The defendant must, among other things, provide a "notice of removal . . . containing a short and plain statement of the grounds for removal." *28 U.S.C. § 1446*. Much like a complaint, the notice of removal "must allege the underlying facts supporting each of the requirements for removal jurisdiction." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Phila. (Defender Ass'n), 790 F.3d 457 (3d Cir. 2015)* (internal quotations omitted).

If the plaintiff believes that removal was improper—that the **[*6]** federal court does not have subject matter jurisdiction or that the defendant did not follow the proper removal procedure—then the plaintiff may ask the federal court to remand the lawsuit to the state court. *28 U.S.C. § 1447(c)*. A motion to remand is analyzed under the same framework as a *Rule 12(b)(1)* motion to dismiss for lack of subject matter jurisdiction. *Papp v. Fore-Kast Sales Co., 842 F.3d 805, 811 (3d Cir. 2016)*. The removing defendant, as the party seeking to invoke the court's subject matter jurisdiction, thus carries the burden of establishing the court's jurisdiction. *Samuel-Bassett v. Kia Motors Am., Inc., 357 F.3d 392, 396 (3d Cir. 2004)*. The plaintiff may challenge whether the defendant has done so, through either a facial challenge or a factual challenge to the notice of removal. *Papp, 842 F.3d at 811*. In a facial challenge, the court looks to the face of the notice of removal and accepts as true the facts alleged by the defendant. *Id.*;

*Hartig Drug Co. v. Senju Pharm. Co., 836 F.3d 261, 268 (3d Cir. 2016)* (explaining that a facial 12(b)(1) challenge is similar to a 12(b)(6) motion to dismiss for failure to state a claim). If the court cannot conclude, based on facts alleged in the notice of removal, that the jurisdictional requirements are met, then the court must remand the matter to state court. *28 U.S.C. § 1447(c)*. A factual challenge, however, "involves the presentation of competing facts," but "should only be considered to the **[*7]** extent that the facts presented, if persuasive, would directly undermine" an element required for jurisdiction. *Papp, 842 F.3d at 811 and n.4*.

Plaintiffs here challenge the Court's jurisdiction under both the federal officer removal statute and CAFA. As to federal officer removal, Plaintiffs raise a facial challenge to the Notice of Removal. The Court therefore must analyze the Notice of Removal, as it pertains to federal officer removal, much in the same way it would a complaint under *Rule 12(b)(6)*. Regarding removal under CAFA, however, Plaintiffs raise a factual challenge by offering competing facts and by seeking discovery concerning the citizenship of the potential class. As the Court will explain, the Court does not need to reach the CAFA issue, as the Motion to Remand can be resolved on federal officer removal grounds.

A. Federal officer removal

The federal officer removal statute provides, in relevant part, that a state civil action may be removed to federal court if it "is against or directed to . . . [t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act **[*8]** under color of such office." *28 U.S.C. § 1442(a)(1)*. This removal statute differs from other removal statutes in two significant ways. First, most removal statutes "are to be strictly construed against removal and all doubts should be resolved in favor of remand." *A.S. v. SmithKline Beecham Corp., 769 F.3d 204, 208 (3d Cir. 2014)* (internal quotations omitted). In contrast, the federal officer removal statute is to be construed broadly and in favor of removal. *Defender Ass'n, 790 F.3d at 466-67*. Second, the well-pleaded complaint rule generally applies to removal statutes, but the federal officer removal statute is excepted from that rule. *Id. at 466*. The well-pleaded complaint rule says that, absent diversity jurisdiction, "a defendant may not remove a case to federal court unless the plaintiff's complaint establishes that the case arises under federal law." *Kircher v. Putnam Funds Trust, 547 U.S. 633, 644 n.12, 126 S. Ct. 2145, 165 L.*

*Ed. 2d 92 (2006)*. The federal officer removal statute, however, is based on whether the defendant's notice of removal states a colorable federal defense. *Defender Ass'n, 790 F.3d at 466*.

In order for a defendant to properly remove under this statute, the defendant must show that (1) he is a "person" within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct "acting under" the United States, its agencies, or its officers; (3) the plaintiff's claims against him are **[*9]** "for or relating to" an act under color of federal office; and (4) the defendant raises a colorable federal defense to the plaintiff's claims. *Id. at 467*. UPMC and Plaintiffs contend, and the Court agrees, that UPMC is a "person" within the meaning of the federal officer removal statute. *See id. at 467-68* (holding that "person" includes corporations and other business entities). The parties dispute the other three elements.

*i. Whether UPMC was "acting under" the United States, its agencies, or its officers*

The first element that the parties dispute is whether Plaintiffs' claims are based upon UPMC's conduct "acting under" the United States, its agencies, or its officers. As explained by the Supreme Court and the Third Circuit, "[t]he words 'acting under' describe 'the triggering relationship between a private entity and a federal officer.'" *Id. at 468* (quoting *Watson v. Philip Morris Companies, Inc., 551 U.S. 142, 149, 127 S. Ct. 2301, 168 L. Ed. 2d 42 (2007))*. Although "acting under" suggests something "akin to an agency relationship," *Cty. of San Mateo v. Chevron Corp., 960 F.3d 586, 599 (9th Cir. 2020)* (citing *Watson, 551 U.S. at 151*), the phrase is broad and, like the federal officer removal statute as a whole, should be construed liberally, *Defender Ass'n, 790 F.3d at 468; Papp, 842 F.3d at 812*. Thus, the relevant inquiry to determine the existence of the requisite relationship is not whether there is an agent-principal arrangement between the private **[*10]** entity and the government. *See Watson, 551 U.S. at 156* (indicating that the types of relationships that may trigger the federal officer removal statute include, but are not limited to, those established by contract or payment, employer-employee relationships, and agent-principal arrangements). Rather, the proper question is whether the private entity's complained-of conduct "'involve[s] an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior.'" *Defender Ass'n, 790 F.3d at 468* (quoting *Watson, 551 U.S. at 152*).

2020 U.S. Dist. LEXIS 136077, *10

Supreme Court and Third Circuit decisions provide some boundaries for this broad inquiry into what constitutes "an effort to assist, or to help carry out" a federal superior's duties or tasks. As an initial matter, it is not necessary that the complained-of conduct be done at the specific behest of the federal superior. *Papp, 842 F.3d at 813*. It is enough that the complained-of conduct took place while the private entity provided assistance to the federal superior. *Id.* Moreover, any dispute about whether the allegedly wrongful conduct was outside the scope of the private entity's duties is the very thing that should be left to a federal court to decide. *Defender Ass'n, 790 F.3d at 472* ("As the Supreme Court has noted, whether a federal officer defendant has completely stepped **[*11]** outside of the boundaries of its office is for a federal court, not a state court, to answer."). After all, the federal officer removal statute is triggered when the plaintiff's "allegations are directed at the relationship between the [private entity-defendant] and the [federal officer or agency]." *Id. at 470*.

The "classic case of such assistance" occurs when a private contractor helps the federal government by producing an item that it needs. *Papp, 842 F.3d at 812* (citing *Watson, 551 U.S. at 153*). Likewise, a private entity is "acting under" a federal officer when the government uses that private entity "to achieve an end it would have otherwise used its own agents to complete." *Id.* (internal quotations omitted). For example, in *Papp v. Fore-Kast Sales Co.*, the plaintiff brought a failure-to-warn product liability suit in state court against several defendants, including Boeing. *Id. at 809*. The plaintiff alleged that his wife "suffered secondary 'take home' asbestos exposure while washing the work clothes of her first husband." *Id.* Her first husband's work involved sandblasting the landing gear of C-47 military cargo planes, which were built by Boeing's predecessor company for the United States Navy and Air Force. *Id.* Boeing removed the matter **[*12]** to federal court on the basis of the federal officer removal statute. *Id. at 810*. The Third Circuit found that *Papp* presented "an archetypal case" of an entity "acting under" a federal officer, in that the plaintiff's allegations were "directed at actions Boeing took while working under a federal contract to produce an item the government needed, to wit, a military aircraft, and that the government otherwise would have been forced to produce on its own." *Id. at 813*.

Similarly, in *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Association of Philadelphia*, the Commonwealth of Pennsylvania and several Pennsylvania counties sought to prevent

attorneys from the Federal Community Defender Organization from representing clients in state post-conviction proceedings. *Defender Ass'n, 790 F.3d at 461*. The Federal Community Defender removed the matter to federal court under the federal officer removal statute. *Id.* The Third Circuit noted that the Federal Community Defender was created through the *Criminal Justice Act*, in part for the purpose of providing representation to indigent federal habeas corpus petitioners. *Id. at 472*. As such, the Third Circuit found, "the Federal Community Defender's representation of state prisoners **[*13]** in [*Pennsylvania's Post-Conviction Review Act*] proceedings is closely related to its duty to provide effective federal habeas representation." *Id.* The court thus held that the Federal Community Defender "provides a service the federal government would itself otherwise have to provide." *Id. at 469*. The Federal Community Defendant was therefore "acting under" the federal government when it engaged in the conduct that the plaintiffs sought to stop. *Id.*

In contrast, however, "compliance (or noncompliance) with federal laws, rules, and regulations does not by itself [bring a party] within the scope of the statutory phrase 'acting under' a federal 'official.'" *Watson, 551 U.S. at 153*. In *Watson v. Philip Morris Companies, Inc.*, Philip Morris argued that it was entitled to federal officer removal because it was subject to detailed regulation and supervision by the Federal Trade Commission (FTC) in relation to cigarette testing. *Id.* The Supreme Court disagreed, stating that "though we find considerable regulatory detail and supervision, we can find nothing that warrants treating the FTC/Philip Morris relationship as distinct from the usual regulator/regulated relationship." *Id. at 157*. The Court noted that a "[a] contrary determination **[*14]** would expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *Id. at 153*. The Court explained that neither the language nor purposes of the federal officer removal statute supported expanding the statute to such a degree. *Id. at 152*.

In summary, something more than regulation by the federal government or compliance with federal law by the private entity is required to establish an "acting under" relationship between the private entity and the federal government. That said, the burden is not so high that a private entity must establish that it has an agency relationship with the federal government. The private entity need only show that the allegations in the complaint are directed at the private entity's efforts to

assist a federal superior.

According to UPMC, Plaintiffs' allegations are directed at UPMC's efforts to assist the federal government in building a nationwide network of interoperable health information technology. (ECF No. 1, at 1). The federal government, as one of the largest purchasers of healthcare services, "has emphasized the important role that health [information technology] [*15] plays in improving both the quality and efficiency of healthcare in the United States." *Id.* at ¶¶ 16-17. To that end, President Bush first established the National Health Information Technology Coordinator by executive order in 2004. Exec. Order No. 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004). The National Coordinator, an advisor to the Secretary of DHHS, was "to provide leadership for the development and nationwide implementation of an interoperable health information technology infrastructure to improve the quality and efficiency of health care." *Id.* The National Coordinator's responsibilities included coordinating efforts of the public and private healthcare sectors and collaborating with public and private interests. *Id.*

Then, in 2009, Congress enacted the Health Information Technology for Economic and Clinical Health Act (HITECH Act),[2] which created the Office of the National Coordinator for Health Information Technology (ONC) within DHHS. *42 U.S.C. § 300jj-11*. The HITECH Act gave the ONC much the same responsibilities and objectives as the 2004 executive order gave the National Coordinator, including coordinating and collaborating with the private healthcare sector. *Id.* The Act also appropriated funds for DHHS to "invest in the infrastructure necessary to [*16] allow for and promote the electronic exchange and use of health information for each individual in the United States." *42 U.S.C. § 300jj-31*. In that vein, the Act created the Meaningful Use Program. *42 U.S.C. §§ 1395w-4(o)*, *1395ww(n)*; *42 C.F.R. § 495.2*. Under this program, eligible healthcare providers receive incentive payments from DHHS if they demonstrate "meaningful use" of certified EHR technology. *42 U.S.C. §§ 1395w-4(o)*, *1395ww(n)*; *42 C.F.R. § 495.2*.

DHHS structured the Meaningful Use Program in stages. *75 Fed. Reg. 44,321*-22; *42 C.F.R. §§ 495.20-495.24*. At each progressive stage, DHHS increased the

criteria required to receive greater incentive payments. *75 Fed. Reg. 44,321*-22; *42 C.F.R. §§ 495.20-495.24*. For example, to receive incentive payments at Stage 2, an eligible provider must, among other things, show that a certain percentage of patients' health records are available to the patients in an electronic format. (ECF No. 1-3, at 144-45 (CMS, *EHR Incentive Programs for Eligible Professionals: What You Need to Know for 2015 Tipsheet*)). At Stage 3, an eligible provider must show that a certain percentage of patients have also actually accessed their records electronically. *Id.* at 149 (CMS, *Eligible Professional Medicaid EHR Incentive Program Stage 3 Objectives and Measures, Objective 6 of 8*). According to UPMC, "[o]nline patient portals have been the most effective and efficient way to [*17] meet many of the objectives in the federal Meaningful Use Program." (ECF No. 1, at ¶ 30). And, meeting the program's criteria relative to patient participation and usership requires raising awareness of a provider's website and patient portal, as well as ensuring that the website and portal are "engaging and user-friendly." *Id.* at 1; (ECF No. 1-3, at 163 (ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements*)).

UPMC, as a participant in the Meaningful Use Program, receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria. (ECF No. 1, at ¶ 39). In particular, UPMC must, among other things, raise awareness and increase usability of the UPMC website and the MyUPMC portal. *Id.* at 1, ¶ 42. Plaintiffs' Complaint addresses the design and functionality of UPMC's website and patient portal, implicating UPMC's implementation of the Meaningful Use Program, particularly as the implementation involves patient engagement and usership. The fact that the government offers payment in exchange for UPMC's voluntary participation in implementing a nationwide EHR network shows the relationship [*18] between UPMC and DHHS is less like the regulator-regulated relationship in *Watson* and more like the government contractor relationship in *Papp*. And, Plaintiffs' allegations are directed at this relationship. UPMC is therefore "acting under" a federal superior for purposes of the federal officer removal statute.

### ii. Whether Plaintiffs' claims are "for or relating to" an act under color of federal office

Next, the parties dispute whether Plaintiffs' claims are "for or relating to" an act under color of federal office. To

---

[2] The HITECH Act was enacted as a part of the American Recovery and Reinvestment Act of 2009, at *Pub. L. No. 111-5, Title XIII, 123 Stat. 115 (2009)*. The HITECH Act is codified in scattered sections of title 42 of the United States Code.

establish this element, the removing defendant only needs to show that there is a "a 'connection' or 'association'" between the act in question and the federal office." *Defender Ass'n, 790 F.3d at 471*. This is a broad standard: as noted by the Third Circuit, Congress's addition of "or relating to" in 2011 "was intended to broaden the universe of acts that enable Federal officers to remove to Federal court." *Id. at 471-72* (internal quotations omitted). Here, Plaintiffs' allegations target mechanisms by which UPMC manages and markets its website and patient portal. There is plainly a connection or association between UPMC's website management and marketing strategies and the Meaningful Use program, particularly the incentives **[*19]** that are tied to patient participation and usability. Plaintiffs' claims are therefore "for or relating to" an act under color of federal office.

### iii. Whether UPMC has raised a colorable federal defense

Lastly, the parties dispute whether UPMC has raised a defense that is both colorable and based in federal law. A defense is colorable if it is "'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp, 842 F.3d at 815* (quoting *Colorable Claim*, Black's Law Dictionary (10th ed. 2014)). This does not mean, however, that the defendant must "win his case before he can have it removed." *Id.* (internal quotations omitted); *see also Cessna v. REA Energy Coop., Inc., 753 Fed. Appx. 124, 128 (3d Cir. 2018)* (quoting *Jefferson County v. Acker, 527 U.S. 423, 432, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999))* ("But '[t]o choose between' these competing interpretations of . . . the law 'is to decide the merits of this case,' which 'would defeat the purpose of the removal statute.'"). As to the requirement that the defense be based in federal law, the Third Circuit has explained that "[t]his requirement assures that federal courts have Article III jurisdiction over federal officer removal cases." *Defender Ass'n, 790 F.3d at 473*. Accordingly, federal officer removal is "allowed if, and only if, 'it appears that a Federal question or a claim to a Federal right is raised **[*20]** in the case, and must be decided therein.'" *Id. at 472* (quoting *Mesa v. California, 489 U.S. 121, 126-27, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989))*.

Here, UPMC argues that it will raise four colorable federal defenses in response to the Complaint: a duty-based defense under the *Health Insurance Portability and Accountability Act (HIPAA)*; preemption of Plaintiffs'

state law claims by HIPAA; *Buckman* preemption; and the dormant *Commerce Clause*.

*a. Duty-based defense under HIPAA*. The most common type of defense is a duty-based defense. *Defender Ass'n, 790 F.3d at 473*. In the federal officer removal context, a duty-based defense must be one that is "based on a federal duty to act, or the lack of such a duty," such as denying alleged violations of a federal duty. *Id. at 473-74*. In the present Complaint, Plaintiffs make several allegations related to HIPAA. First, Plaintiffs identify UPMC as a covered entity under HIPAA. (ECF No. 1-2, at ¶ 17). Second, the Complaint contains a section entitled "UPMC's Duties of Confidentiality," under which the first subsection is "Federal Law." *Id.* at ¶¶ 23-26. Citing HIPAA, Plaintiffs allege in this subsection that "a health care provider may not disclose personally identifiable information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express **[*21]** written authorization." *Id.* at ¶ 23. And lastly, Plaintiffs allege that under HIPAA, an IP address is considered personally identifiable information, and that cookies and browser fingerprints are protected personal identifiers. *Id.* at ¶¶ 112, 117, 136. In the Notice of Removal, UPMC disagrees and states that it will argue "that the data at issue—the content of web searches, IP addresses, cookies, and browser fingerprints—are not subject to HIPAA." (ECF No. 1, at ¶ 59). Plaintiffs plainly allege that UPMC has a federal duty under HIPAA and that UPMC violated that duty. Because UPMC denies violating its duties under HIPAA, UPMC raises a colorable federal defense.

*b. Preemption defenses.* A defense based on federal preemption of state law is also sufficient to raise a colorable federal defense for the purposes of the federal officer removal statute. *Defender Ass'n, 790 F.3d at 473; Cessna v. REA Energy Coop., Inc., 753 Fed. Appx. 124, 128 (3d Cir. 2018)*. UPMC raises two preemption defenses. First, UPMC contends that "certain state-law privacy standards are preempted under HIPAA." (ECF No. 1, at ¶ 62). Whether or not that is true is for a federal court to decide, as it will require the interpretation of a federal statute. Second, UPMC argues that *Buckman* preemption applies here. In *Buckman* **[*22]** , the plaintiffs alleged that the defendant made fraudulent representations to the Food and Drug Administration in order to obtain approval of a medical device. *Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 343, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001)*. The Supreme Court held that the plaintiffs' state-law fraud-on-the-FDA claims were impliedly preempted

by the *Federal Food, Drug, and Cosmetic Act* because those state-law claims "inevitably conflict[ed] with the FDA's responsibility to police fraud consistently with the Agency's judgment and objectives." *Id. at 348-50*. The Court explained that federal preemption is warranted where "the relationship between a federal agency and the entity it regulates is inherently federal in character." *Id. at 347*. UPMC argues that the nature of its involvement in DHHS's Meaningful Use Program is inherently federal. (ECF No. 1, at ¶ 65). UPMC thus contends it is entitled to federal judicial review to assess allegations that implicate its relationship with DHHS and involvement in the Meaningful Use Program. *Id.* Having already found that UPMC was "acting under" DHHS when it engaged in the complained-of conduct, it follows that the relationship between UPMC and DHHS is "inherently federal" in nature, such that the issue of whether Plaintiffs' state-law claims are preempted **[*23]** under the principles articulated in *Buckman* should be decided by a federal court. In sum, UPMC's HIPAA preemption and *Buckman* preemption defenses are colorable federal defenses.

*c. Dormant Commerce Clause*. Lastly, the dormant *Commerce Clause* "prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 139 S. Ct. 2449, 2459, 204 L. Ed. 2d 801 (2019)*. Accordingly, "a state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the *Commerce Clause*." *Healy v. Beer Inst., 491 U.S. 324, 332, 109 S. Ct. 2491, 105 L. Ed. 2d 275 (1989)*. Presently, UPMC avers that it has providers in states outside of Pennsylvania; its patients come from around the globe; and its website and patient portal "provide an easily accessible, interstate (and international) platform by which providers, patients, and others can manage or learn more about their or others' healthcare." (ECF No. 1, at ¶ 64). UPMC asserts that Plaintiffs' Complaint alleges that "Pennsylvania law—including the legislative proscriptions of the Commonwealth's wiretapping and trade practices statutes—restricts how UPMC can design and manage" its website and patient portal. *Id.* Relying on a Second Circuit case (perhaps because there does not appear to be a Third Circuit case on point), UPMC argues that the dormant *Commerce Clause* provides a defense to Plaintiffs' **[*24]** claims, because "'it is difficult, if not impossible, for a state to regulate internet activities without projecting its legislation into other States.'" *Id.* at ¶ 63 (quoting *Am. Booksellers Found. v. Dean, 342 F.3d 96, 103 (2d Cir. 2003)* (internal quotations omitted)). Because the dormant *Commerce Clause* is federal law, and because

it presents a defense that is "legitimate and [could] reasonably be asserted, given the facts presented and the current law," *Papp, 842 F.3d at 815* (internal quotations omitted), UPMC has raised a colorable federal defense.

In conclusion, UPMC has pleaded facts supporting removal under the federal officer removal statute. UPMC has shown that by its participation in the Meaningful Use Program, it was "acting under" DHHS when it engaged in the conduct that is at issue in the Complaint. Furthermore, the complained-of conduct is "for or relating to" an act under color of office, and UPMC has raised several colorable federal defenses. Consequently, Plaintiffs' Motion to Remand will be denied.

B. Removal under CAFA

Having found that this Court has subject matter jurisdiction under the federal officer removal statute, the Court does not need to reach the issue of whether it also has jurisdiction under CAFA. Accordingly, the Court will not address the parties' **[*25]** CAFA arguments or Plaintiffs' additional Motions filed in support of their Motion to Remand at this time.


III. Conclusion

THEREFORE, based on the foregoing, Plaintiffs' Motion to Remand this matter to state court is hereby DENIED. Additionally, Plaintiffs' Motion for Jurisdictional Discovery is DENIED AS MOOT, and Plaintiffs' Request for Judicial Notice is DENIED AS MOOT.

IT IS SO ORDERED.

DATE July 31, 2020

/s/ Marilyn J. Horan

Marilyn J. Horan

United States District Judge

**End of Document**

# EXHIBIT 4

 Caution
As of: February 22, 2023 3:39 PM Z

# *Doe v. ProMedica Health Sys.*

United States District Court for the Northern District of Ohio, Western Division

October 30, 2020, Decided; October 30, 2020, Filed

Case No. 3:20 CV 1581

**Reporter**

2020 U.S. Dist. LEXIS 244916 *

John Doe, on behalf of themselves and all others similarly situated, Plaintiff, -vs- ProMedica Health System, Inc., Defendant.

**Subsequent History:** Motion denied by *Doe v. ProMedica Health Sys., 2020 U.S. Dist. LEXIS 244914 (N.D. Ohio, Dec. 14, 2020)*

## Core Terms

patient, removal, federal official, colorable, removal statute, portal, Technology, electronic, records, prong

**Counsel:  [*1]** For ProMedica Health System Inc., Defendant: Joshua Rovenger, David A. Carney, Baker & Hostetler - Cleveland, Cleveland, OH.

For John Doe, on behalf of himself and all others similarly situated, Plaintiff: Kevin C. Hulick, Stuart E. Scott, Spangenberg Shibley & Liber, Cleveland, OH; Mitchell M. Breit, Simmons Hanly Conroy, New York, NY; Jason O. Barnes, Simmons Hanly Conroy, St. Louis, MO.

**Judges:** JACK ZOUHARY, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JACK ZOUHARY

## Opinion

### ORDER DENYING MOTION TO REMAND

#### INTRODUCTION

This case concerns whether Defendant improperly released Plaintiff's private information through its on-line healthcare records. The case was filed in Ohio state court, but removed by Defendant based on the federal officer removal statute (Doc. 1). Plaintiff now moves to remand, claiming that statute does not apply to the Complaint in this case (Doc. 14). Defendant opposes remand (Doc. 15).

This Court must satisfy itself that it does have jurisdiction, for, without it, it has no power to further act. The statute at issue is not often used for removal, and the Sixth Circuit has not addressed the issue in a like case. This Court's analysis follows.

#### BACKGROUND

Plaintiff John Doe, a patient of Defendant ProMedica **[*2]** Health Systems, Inc. ("Defendant"), filed this class action alleging Defendant unlawfully disclosed confidential patient data to third-party marketers (Doc. 14-2 at 2-3). Plaintiff alleges this data was taken from information provided through the "patient portal" of Defendant's online website (*id*).

Defendant responds that the creation of its patient portal was part of its participation in a federal program designed to increase use of electronic health records ("EHRs") (Doc. 15 at 6). The parties refer to this program by different titles used over the years; this Court will refer to the federal initiative by its current name, the Promoting Interoperability Programs ("PIP"). This initiative was rolled out in phases over the past 16 years, first conceptualized in a 2004 executive order that established the National Health Information Technology Coordinator, who was tasked with providing "leadership for the development and nationwide implementation of an interoperable health information technology infrastructure to improve the quality and efficiency of health care." Exec. Order No. 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004). In 2009, these responsibilities were assigned to the Department of Health and Human Services ("DHHS"), specifically the **[*3]** newly created Office of the National Coordinator for Health Information Technology, which in

2020 U.S. Dist. LEXIS 244916, *3

turn was established by the Health Information Technology for Economic and Clinical Health Act (HITECH Act). *42 U.S.C. § 300jj-11*. This Act created the Meaningful Use Program. *42 U.S.C. §§ 1395w-4(o), 1395ww(n)*; *42 C.F.R. § 495.2*. Under this program, eligible healthcare providers received incentive payments from DHHS if they demonstrated "meaningful use" of certified EHR technology. *42 U.S.C. §§ 1395w-4(o), 1395ww(n)*; *42 C.F.R. § 495.2*. The Centers for Medicare and Medicaid Services ("CMS"), tasked with administering the incentive payments, renamed the EHR Incentive Programs to PIP in April 2018. According to CMS, "[t]his change moved the programs beyond the existing requirements of meaningful use to a new phase of EHR measurement with an increased focus on interoperability and improving patient access to health information."[1]

Defendant asserts that, in response to this federal program, it created an online patient portal where patients could access their electronic health records via ProMedica's website (Doc. 15 at 7-9). Therefore, they argue removal was proper under the federal officer removal statute. *28 U.S.C.1442(a)(1)*. Plaintiff requests a remand **[*4]** because Defendant has not met its burden (Doc. 14-1 at 4).

## DISCUSSION

Federal courts are courts of limited jurisdiction. *Home Depot U.S.A., Inc. v. Jackson, 139 S. Ct. 1743, 1746, 204 L. Ed. 2d 34 (2019)*; *Kokkonen v. Guardian Life Ins. Co. of America, 511 U. S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)*. On the issue of removal, the Sixth Circuit has held the party seeking removal "bear[s] the burden of establishing federal court jurisdiction." *Mays v. City of Flint, 871 F.3d 437, 442 (6th Cir. 2017)*. *Mays* further held that generally, "removal statues are to be strictly construed, and all doubts should be resolved against removal." *Id.* (internal quotation omitted).

However, in this case, the doubt is not so easily resolved. The federal officer removal statute provides that an action may be removed where the action is "against or directed to ... [t]he United States or any agency thereof or any officer (or any person acting

under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." *28 U.S.C.1442 (a)(1)*. However, *Watson v. Philip Morris Co.* held that the term "acting under" is "broad, and the statute must be liberally construed." *551 U.S. 142, 127 S. Ct. 2301, 2302, 168 L. Ed. 2d 42 (2007)* (internal quotation omitted). In order for a defendant to properly remove under this statute, defendant must show (1) "it is a 'person' . . . who acted under a federal officer"; (2) "it performed the actions for **[*5]** which it is being sued under color of federal office"; and (3) "it raised a colorable federal defense." *Bennett v. MIS Corp., 607 F.3d 1076, 1085 (6th Cir. 2010)*. This Court will address each in turn.

### Acting Under

First, Plaintiff concedes that Defendant is a "person" within the meaning of the federal officer removal statute. (Doc. 14-1 at 4). The parties disagree as to whether Defendant was "acting under" a federal officer while performing the alleged conduct. "Acting under" is not defined in the statute, but whether this prong is satisfied hinges on the type of relationship between the party seeking removal and the federal government. *Watson* interpreted "acting under" to mean that the defendant seeking removal must be in a relationship with the federal government such that the government is functioning as the defendant's superior. *551 U.S. 142, 127 S. Ct. 2301 at 2307, 168 L. Ed. 2d 42*. That relationship "typically involves subjection, guidance, or control" and "must involve an effort to assist, or to help carry out, the duties and tasks of the federal superior." *Id.* "Mere compliance" with the law is not enough. *Id.*

Here, Defendant alleges they created the electronic-health-record patient portal primarily to assist the federal government in its mission for a nationwide system of electronic health **[*6]** records. In return, Defendant took advantage of federal incentives for setting up such a program (Doc. 15 at 7-9). As noted in the briefing, the facts of this case are strikingly similar to those in *Doe I v. UPMC*, which held a medical provider's participation in the Meaningful Use Program was sufficient to satisfy the "acting under" requirement necessary for the federal officer removal statute. *2020 U.S. Dist. LEXIS 136077, 2020 WL 4381675, at *6 (W.D. Pa. 2020)*. There, the court found the participation in PIP was less like the "regulator-regulated" relationship in *Watson* and more like a government-contractor relationship that would satisfy the "acting under" requirement. *Id.*

---

[1] *Promoting Interoperability Programs*, CENTERS FOR MEDICARE & MEDICAID SERVICES (Oct. 27, 2020), https://www.cms.gov/Regulations-and-guidance/Legislation/EHRIncentivePrograms/index?redirect=/EHRIncentiveprograms/

Likewise here, an iteration of the same federal program is at issue. The aim of PIP is to create a unified system of patient electronic health records. Because Defendant's participation assisted the federal government in achieving that goal, Defendant has satisfied the "acting under" prong.

### *Causal Nexus*

The second prong requires Defendant to demonstrate that the actions for which it is being sued were performed "under the color of federal office." *Bennett, 607 F.3d at 1085*. "To satisfy th[is] requirement, [the party seeking removal] must show a nexus, a 'causal connection' between the charged conduct and **[*7]** [the] asserted official authority." *Id. at 1088* (quoting *Jefferson County v. Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 144 L. Ed. 2d 408, (1999))*. "The hurdle erected by this requirement is quite low." *In re Nat'l Prescription Opiate Litig., 327 F. Supp. 3d 1064, 1076 (N.D. Ohio 2018)* (citation omitted).

Here, the claims alleged by Plaintiff implicate Defendant's electronic-health-record patient portal, and Defendant's handling of this electronic information is central to the claims in this case. Defendant alleges the patient portal was created directly in response to PIP (Doc. 15 at 7-9). As *UPMC* held, "There is plainly a connection or association between [the health care provider's] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability." *2020 U.S. Dist. LEXIS 136077, 2020 WL 4381675, at *6*. So too here, Defendant has demonstrated that they have satisfied the causal nexus requirement.

### *Colorable Federal Defense*

The final prong requires that the party seeking removal show they have raised a colorable federal defense. *Bennett, 607 F.3d at 1085*. This too has been described as a "low bar" and merely requires Defendant's assertion on this point to be "defensive" and "based in federal law". *In re Nat'l Prescription Opiate Litig., 327 F. Supp. at 1077* (citing *Mesa v. California, 489 U.S. 121, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989))*. In the context of removal under the federal officer removal statute, the Sixth Circuit has stated that a colorable defense "need only be plausible. **[*8]** *Bennett, 607 F.3d at 1089*" (citations omitted). Defendant argues that it will raise

preemption defenses, including Health Insurance Portability and Accountability Act ("HIPAA") (Doc. 15 at 13-15). A defense based on federal preemption of state law is sufficient to raise a colorable federal defense for the purposes of the federal officer removal statute. *2020 U.S. Dist. LEXIS 136077, 2020 WL 4381675, at *7* (citing *In re Def. Ass'n of Philadelphia, 790 F.3d 457, 473 (3d Cir. 2015)*; *Cessna v. REA Energy Coop., Inc., 753 F. App'x. 124, 128 (3d Cir. 2018))*. Without reaching the merits of these defenses, which would be improper at this stage, this Court notes that either defense would require the interpretation of federal law and are colorable on their face. Because of this, Defendant has met the third and final prong.

### CONCLUSION

Plaintiff's Motion to Remand (Doc. 14) is denied. This Court will next schedule a Case Management Conference with counsel completing a Report of the Parties' Planning Meeting in advance.

IT IS SO ORDERED.

/s/ *Jack Zouhary*

JACK ZOUHARY

U.S. DISTRICT JUDGE

October 30, 2020

---

**End of Document**

# EXHIBIT 5

DocuSign Envelope ID: B3ECAA06-2409-4689-9B98-B9C685F658F8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHNATHON MOHR,<br>for himself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br><br>THE TRUSTEES OF THE UNIVERSITY<br>OF PENNSYLVANIA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) (Removal from: The Court of Common Pleas of<br>)  Philadelphia County, Case No. 230102149)<br>)<br>)<br>)<br>)<br>)<br>) |

I, Anna Schoenbaum, make this declaration pursuant to 28 U.S.C. § 1746 and hereby declare and state as follows:

1. I have personal knowledge of and/or access to the matters and information set forth in this Declaration, and could testify to these matters if called upon to do so.

2. I am currently the Vice President of Clinical Applications within the Department of Information Services of Penn Medicine.

3. In that role, my responsibilities include managing enterprise-wide projects and programs involving electronic health records ("EHRs") for Penn Medicine, which includes the Hospital of the University of Pennsylvania ("HUP").

4. Penn Medicine maintains a secure website where patients can access parts of their EHRs, communicate with their providers, schedule their appointments, be notified of their test results and take other certain actions, mypennmedicine.org ("Patient Portal").

5. The Patient Portal has been in operation for ambulatory practices since 2008.

6. During that period, Penn Medicine and its providers ("Penn Providers"), including HUP, have accepted payments from federal programs including Medicare and Medicaid, overseen by the federal Department of Health and Human Services' Centers for Medicare and Medicaid Services ("CMS").

7. Starting in 2011, Penn Providers obtained financial incentives from Medicare and Medicaid for being "meaningful EHR users," as defined by CMS, thereby assisting CMS in meeting its goals of expanding access to and use of EHRs through a program currently known as the Medicare Promoting Interoperability Program.

8. Starting in 2015, Penn Providers avoided payment reductions from Medicare and Medicaid by remaining "meaningful EHR users," as defined by CMS, thereby assisting CMS in meeting its goals of expanding access to and use of EHRs.

9. The Patient Portal is the platform through which Penn Providers have met certain criteria set forth by CMS.

10. For example, the Patient Portal is the way in which Penn Providers have met criteria related to secure messaging and EHR access.

11. The Patient Portal is also the method by which Penn Providers comply with requirements and government guidance relating to the federal 21st Century Cures Act that prohibits practices that are likely to interfere with the access, exchange, or use of Electronic Health Information ("EHI"). If a patient requests that EHI be made available through the Patient Portal, then such requested EHI must be made available without delay unless certain exceptions apply.

12. The Patient Portal makes use of federally-certified electronic health records technology ("CEHRT").

13. EPIC provides CEHRT that helps support the Patient Portal.

14. In order to ensure Penn Providers are able to meet these federal meaningful use and interoperability criteria and to help avoid potential Medicare payment reductions or other penalties for noncompliance, patients must be aware of the Patient Portal, understand the benefits and options that are available to them within the Patient Portal, and find the Patient Portal easy to use.

15. Penn Providers rely on several methods to help promote access to the Patient Portal. These include the use of third-party technology on websites like pennmedicine.org.

16. Penn Medicine uses tracking technologies, such as cookies and Facebook pixels, to better understand the path users of Penn Medicine's consumer-facing website take to navigate to the Patient Portal and to make any necessary changes to remove obstacles to that navigation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief. Executed this 22nd day of February, 2023 in Philadelphia, PA.

DocuSigned by:

*Anna Schoenbaum*

8F9B694DEC3746E...

Anna Schoenbaum

# EXHIBIT 6

# Promoting Interoperability
PROGRAMS

## MEDICARE PROMOTING INTEROPERABILITY PROGRAM ELIGIBLE HOSPITALS, CRITICAL ACCESS HOSPITALS, AND DUAL-ELIGIBLE HOSPITALS ATTESTING TO CMS OBJECTIVES AND MEASURES FOR 2020

The following information is for eligible hospitals, critical access hospitals (CAHs), and dual-eligible hospitals attesting to CMS for their participation in the Medicare Promoting Interoperability Program in 2020. Those attesting to their state should refer to the 2020 Promoting Interoperability Medicaid specification sheets.

| Objective | Provider to Patient Exchange |
|-----------|------------------------------|
| Measure | **Provide Patients Electronic Access to Their Health Information**<br>For at least one unique patient discharged from the eligible hospital or CAH inpatient or emergency department (POS 21 or 23) the patient (or patient-authorized representative) is provided timely access to view online, download, and transmit his or her health information; and the eligible hospital or CAH ensures the patient's health information is available for the patient (or patient-authorized representative) to access using any application of their choice that is configured to meet the technical specifications of the application programming interfaces (API) in the eligible hospital or CAH's certified electronic health record technology (CEHRT). |

## Definition of Terms

**API**: A set of programming protocols established for multiple purposes. APIs may be enabled by an eligible hospital or CAH to provide the patient with access to their health information through a third-party application with more flexibility than is often found in many current "patient portals."

**Provide Access**: When a patient possesses all of the necessary information needed to view, download, or transmit their information. This could include providing patients with instructions on how to access their health information, the website address they must visit for online access, a unique and registered username or password, instructions on how to create a login, or



any other instructions, tools, or materials that patients need in order to view, download, or transmit their information.

**Appropriate Technical Capabilities**: A technical capability would be appropriate if it protected the electronic health information created or maintained by the CEHRT. All of these capabilities could be part of the CEHRT or outside systems and programs that support the privacy and security of CEHRT.

**View**: The patient (or authorized representative) accessing their health information online.

**Download**: The movement of information from online to physical electronic media.

**Transmission:** This may be any means of electronic transmission according to any transport standard(s) (SMTP, FTP, REST, SOAP, etc.). However, the relocation of physical electronic media (for example, USB, CD) does not qualify as transmission, although the movement of the information from online to the physical electronic media will be considered a download.

**Diagnostic Test Results:** All data needed to diagnose and treat disease. Examples include, but are not limited to, blood tests, microbiology, urinalysis, pathology tests, radiology, cardiac imaging, nuclear medicine tests, and pulmonary function tests.

## Reporting Requirements

- DENOMINATOR: The number of unique patients discharged from an eligible hospital or CAH inpatient or emergency department (POS 21 or 23) during the EHR reporting period.
- NUMERATOR: The number of patients in the denominator (or patient authorized representative) who are provided timely access to health information to view online, download and transmit to a third party and to access using an application of their choice that is configured to meet the technical specifications of the API in the eligible hospitals or CAHs CEHRT.
- The EHR reporting period in 2020 for new and returning participants attesting to CMS is any continuous 90-day period within the calendar year.

## Scoring Information

- Total points available for this measure: 40 points.
- 100 total points will be available for the required objectives and measures of the Medicare Promoting Interoperability Program.
- In order to earn a score greater than zero, an eligible hospital or CAH must complete the activities required by the Security Risk Analysis measure and submit their complete numerator and denominator or yes/no data for all required measures.

- *Rounding*: When calculating the performance rates and measure and objective scores, we stated that we would generally round to the nearest whole number. Scores under 50 points would not be considered meaningful users.

## Additional Information

- Continuing in program year 2020, eligible hospitals and CAHs must use 2015 Edition CEHRT. The 2015 Edition functionality must be in place by the first day of the EHR reporting period and the product must be certified to the 2015 Edition criteria by the last day of the EHR reporting period. The eligible hospital or CAH must be using the 2015 Edition functionality for the full EHR reporting period. In many situations the product may be deployed, but pending certification.
- To implement an API, the eligible hospital or CAH provider would need to fully enable the API functionality such that any application chosen by a patient would enable the patient to gain access to their individual health information provided the application is configured to meet the technical specifications of the API. Eligible hospitals or CAHs may not prohibit patients from using any application, including third-party applications, which meet the technical specifications of the API, including the security requirements of the API. Eligible hospitals or CAHs are expected to provide patients with detailed instructions on how to authenticate their access through the API and provide the patient with supplemental information on available applications that leverage the API.
- Similar to how eligible hospitals or CAHs support patient access to view, download, transmit capabilities, eligible hospitals or CAHs should continue to have identity verification processes to ensure that a patient using an application, which is leveraging the API, is provided access to their health information.
- Any patient health information must be made available to the patient within 36 hours of its availability to the eligible hospital or CAH.
- Eligible hospitals or CAHs may withhold from online disclosure of any information, either prohibited by federal, state, or local laws, or if such information provided through online means may result in significant harm.
- The patient must be able to access this information on demand, such as through a patient portal or personal health record, or by other online electronic means. We note that while a covered entity may be able to fully satisfy a patient's request for information through view, download, and transmit, the measure does not replace the covered entity's responsibilities to meet the broader requirements under the Health Insurance Portability and Accountability Act (HIPAA) to provide an individual, upon request, with access to public health information in a designated record set.

- Eligible hospitals or CAHs should also be aware that while meaningful use is limited to the capabilities of CEHRT to provide online access, there may be patients who cannot access their EHRs electronically because of a disability. Eligible hospitals or CAHs who are covered by civil rights laws must provide individuals with disabilities equal access to information and appropriate auxiliary aids and services as provided in the applicable statutes and regulations.
- A patient who has multiple encounters during the EHR reporting period, or even in subsequent EHR reporting periods in future years, needs to be provided access for each encounter where they are discharged from the eligible hospital or CAH inpatient or emergency department.
- If a patient elects to "opt out" of participation, that patient must still be included in the denominator.
- If a patient elects to "opt out" of participation, the eligible hospital or CAH may count the patient in the numerator if the patient is provided all of the necessary information to subsequently access their information, obtain access through a patient authorized representative, or otherwise opt back-in without further follow up action required by the eligible hospital or CAH.
- The eligible hospital or CAH must continue to update the information accessible to the patient each time new information is available.
- For the Provide Patients Electronic Access to Their Health Information measure, the required fields are:
  - *Ambulatory setting only*. Provider's name and office contact information.
  - *Inpatient setting only*. Admission and discharge dates and locations; discharge instructions; and reason(s) for hospitalization.
  - Laboratory test report(s).
  - Diagnostic image report(s).
- Regarding the measure's API, the required data set is the Common Clinical Data Set (https://www.healthit.gov/sites/default/files/ccds_reference_document_v1_1.pdf).

## Regulatory References

- This objective and measure may be found in Section 42 of the code of the federal register at 42 CFR 495.24 (e)(7)(i). For further discussion, please see 83 FR 41634 through 41677.
- In order to meet this measure, an eligible hospital or CAH must possess the capabilities and standards of CEHRT at 45 CFR 170.315 (e)(1), (g)(7), (g)(8), and (g)(9).

## Certification Criteria and Standards

Below is the corresponding certification criteria and standards for EHR technology that supports this measure.

| Certification Criteria |
| --- |
| Information about certification for 2015 Edition CEHRT can be found at: |
| § 170.315(e)(1) Patient Engagement - View, Download, and Transmit to 3rd Party |
| § 170.315(g)(7) Application Access – Patient Selection |
| § 170.315(g)(8) Application Access – Data Category Request |
| § 170.315(g)(9) Application Access – All Data Request |

| Certification Standards |
| --- |
| Standards for 2015 Edition CEHRT can be found at the ONC's 2015 Standards Hub: |
| https://www.healthit.gov/topic/certification/2015-standards-hub |



# Medicare Promoting Interoperability Program Eligible Hospitals, Critical Access Hospitals, and Dual-Eligible Hospitals Attesting to CMS Objectives and Measures for the 2021 Reporting Period

The following information is for eligible hospitals, critical access hospitals (CAHs), and dual-eligible hospitals attesting to CMS for their participation in the Medicare Promoting Interoperability Program in 2021. Those attesting to their State should refer to the 2021 Promoting Interoperability Medicaid specification sheets.

| Objective | Provider to Patient Exchange |
|---|---|
| Measure | **Provide Patients Electronic Access to Their Health Information**<br>For at least one unique patient discharged from the eligible hospital or CAH inpatient or emergency department (POS 21 or 23) the patient (or patient-authorized representative) is provided timely access to view online, download, and transmit his or her health information; and the eligible hospital or CAH ensures the patient's health information is available for the patient (or patient-authorized representative) to access using any application of their choice that is configured to meet the technical specifications of the application programming interfaces (API) in the eligible hospital or CAHs certified electronic health record technology (CEHRT). |

## Definition of Terms

**API**: A set of programming protocols established for multiple purposes. APIs may be enabled by an eligible hospital or CAH to provide the patient with access to their health information through a third-party application with more flexibility than is often found in many current "patient portals."

**Provide Access**: When a patient possesses all of the necessary information needed to view, download, or transmit their information. This could include providing patients with instructions on how to access their health information, the website address they must visit for online access, a unique and registered username or password, instructions on how to create a login, or any other instructions, tools, or materials that patients need in order to view, download, or transmit their information.

**Appropriate Technical Capabilities**: A technical capability would be appropriate if it protected the electronic health information created or maintained by the CEHRT. All of these capabilities could be part of the CEHRT or outside systems and programs that support the privacy and security of CEHRT.

**View**: The patient (or authorized representative) accessing their health information online.



**Download**: The movement of information from online to physical electronic media.

**Transmission:** This may be any means of electronic transmission according to any transport standard(s) (SMTP, FTP, REST, SOAP, etc.). However, the relocation of physical electronic media (for example, USB, CD) does not qualify as transmission, although the movement of the information from online to the physical electronic media will be considered a download.

## Reporting Requirements

- DENOMINATOR: The number of unique patients discharged from an eligible hospital or CAH inpatient or emergency department (POS 21 or 23) during the EHR reporting period.
- NUMERATOR: The number of patients in the denominator (or patient authorized representative) who are provided timely access to health information to view online, download and transmit to a third party and to access using an application of their choice that is configured to meet the technical specifications of the API in the eligible hospitals or CAHs CEHRT.
- The EHR reporting period in 2021 for new and returning participants attesting to CMS is any continuous 90-day period within the calendar year.

## Scoring Information

- Total points available for this measure: 40 points.
- 100 total points will be available for the required objectives and measures of the Medicare Promoting Interoperability Program.
- In order to earn a score greater than zero, an eligible hospital or CAH must complete the activities required by the Security Risk Analysis measure, submit their complete numerator and denominator or Yes/No data for all required measures, attest to program questions on the Prevention of Information Blocking and the ONC Direct Review, as well as report on the required electronic clinical quality measure data.
- Failure to report at least a "1" in all required measures with a numerator or reporting a "No" for a Yes/No response measure will result in a total score of 0 points for the Promoting Interoperability Program. Such eligible hospitals or CAHs who fail to achieve a minimum total score of 50 points are not considered meaningful users and may undergo a downward payment adjustment.
- *Rounding*: When calculating the performance rates and measure and objective scores, scores will be rounded to the nearest whole number.

## Additional Information

- In 2021, eligible hospitals and CAHs may use technology meeting the existing 2015 Edition certification criteria, the 2015 Edition Cures Update criteria, or a combination of the two in order to meet the CEHRT definition.
- To learn more about the 2015 Edition Cures Update and the changes to 2015 Edition certification criteria finalized in the 21st Century Cures Act final rule (85 FR 25642), we encourage hospitals to visit https://www.healthit.gov/curesrule/final-rule-policy/2015-edition-cures-update.
- To check whether a health IT product that has been certified to the 2015 Edition Cures Update criteria, visit the Certified Health IT Product List (CHPL) at https://chpl.healthit.gov/.



- 2015 Edition or 2015 Edition Cures Update functionality must be used as needed for a measure action to count in the numerator during an EHR reporting period. However, in some situations the product may be deployed during the EHR reporting period but pending certification. In such cases, the product must be certified to the 2015 Edition or 2015 Edition Cures Update criteria by the last day of the EHR reporting period.
- For the measure, eligible hospitals and CAHs must offer all four functionalities (view, download, transmit, and access through API) to their patients.
- To implement an API, the eligible hospital or CAH would need to fully enable the API functionality such that any application chosen by a patient would enable the patient to gain access to their individual health information provided the application is configured to meet the technical specifications of the API. Eligible hospitals or CAHs may not prohibit patients from using any application, including third-party applications, which meet the technical specifications of the API, including the security requirements of the API. Eligible hospitals or CAHs are expected to provide patients with detailed instructions on how to authenticate their access through the API and provide the patient with supplemental information on available applications that leverage the API.
- Similar to how eligible hospitals or CAHs support patient access to view, download, transmit capabilities, eligible hospitals or CAHs should continue to have identity verification processes to ensure that a patient using an application, which is leveraging the API, is provided access to their health information.
- Any patient health information must be made available to the patient within 36 hours of its availability to the eligible hospital or CAH.
- Eligible hospitals or CAHs may withhold from online disclosure of any information, either prohibited by federal, state, or local laws, or if such information provided through online means may result in significant harm.
- The patient must be able to access this information on demand, such as through a patient portal or personal health record, or by other online electronic means. We note that while a covered entity may be able to fully satisfy a patient's request for information through view, download, and transmit, the measure does not replace the covered entity's responsibilities to meet the broader requirements under the Health Insurance Portability and Accountability Act (HIPAA) to provide an individual, upon request, with access to public health information in a designated record set.
- Eligible hospitals or CAHs should also be aware that while meaningful use is limited to the capabilities of CEHRT to provide online access, there may be patients who cannot access their EHRs electronically because of a disability. Eligible hospitals or CAHs who are covered by civil rights laws must provide individuals with disabilities equal access to information and appropriate auxiliary aids and services as provided in the applicable statutes and regulations.
- A patient who has multiple encounters during the EHR reporting period, or even in subsequent EHR reporting periods in future years, needs to be provided access for each encounter where they are discharged from the eligible hospital or CAH inpatient or emergency department.
- If a patient elects to "opt out" of participation, that patient must still be included in the denominator.



- If a patient elects to "opt out" of participation, the eligible hospital or CAH may count the patient in the numerator if the patient is provided all of the necessary information to subsequently access their information, obtain access through a patient authorized representative, or otherwise opt back-in without further follow up action required by the eligible hospital or CAH.
- The eligible hospital or CAH must continue to update the information accessible to the patient each time new information is available.
- Actions included in the numerator must occur within the self-selected EHR reporting period.
- For Provide Patients Electronic Access to Their Health Information, the required content is:
  - The Common Clinical Data Set (https://www.healthit.gov/sites/default/files/ccds_reference_document_v1_1.pdf) or USCDI (https://www.healthit.gov/isa/united-states-core-data-interoperability-uscdi).
  - Ambulatory setting only. Provider's name and office contact information.
  - Inpatient setting only. Admission and discharge dates and locations; discharge instructions; and reason(s) for hospitalization.
  - Laboratory test report(s).
  - Diagnostic image report(s).
- For API access the required content is the Common Clinical Data Set (https://www.healthit.gov/sites/default/files/ccds_reference_document_v1_1.pdf) or USCDI (https://www.healthit.gov/isa/united-states-core-data-interoperability-uscdi).

### Regulatory References

- This objective and measure may be found in Title 42 of the Code of Federal Regulations at 42 CFR 495.24 (e)(7)(i). For further discussion, please see 83 FR 41634 through 41677.
- In order to meet this measure, an eligible hospital or CAH must use technology certified to the criteria at 45 CFR 170.315 (e)(1), (g)(7), (g)(8) or (g)(10), and (g)(9).

### Certification Criteria

Below are the corresponding certification criteria for EHR technology that supports this measure.

| Certification Criteria |
| --- |
| Information about certification criteria can be found at: |
| § 170.315(e)(1) Patient Engagement - View, Download, and Transmit to 3rd Party |
| § 170.315(g)(7) Application Access – Patient Selection |
| § 170.315(g)(8) Application Access – Data Category Request |
| § 170.315(g)(9) Application Access – All Data Request |
| § 170.315(g)(10) Application Access – Standardized API for Patient and Population Services |



# Medicare Promoting Interoperability Program for Eligible Hospitals and Critical Access Hospitals

## Objectives and Measures for the 2022 EHR Reporting Period

The following information is for eligible hospitals and critical access hospitals (CAHs) attesting to CMS for their participation in the Medicare Promoting Interoperability Program in 2022.

| Objective | Provider to Patient Exchange |
|---|---|
| Measure | **Provide Patients Electronic Access to Their Health Information**<br>For at least one unique patient discharged from the eligible hospital or CAH inpatient or emergency department (POS 21 or 23) the patient (or patient-authorized representative) is provided timely access to view online, download, and transmit his or her health information; and the eligible hospital or CAH ensures the patient's health information is available for the patient (or patient-authorized representative) to access using any application of their choice that is configured to meet the technical specifications of the application programming interfaces (API) in the eligible hospital or CAHs certified electronic health record technology (CEHRT). |

## Definition of Terms

**API**: A set of programming protocols established for multiple purposes. APIs may be enabled by an eligible hospital or CAH to provide the patient with access to their health information through a third-party application with more flexibility than is often found in many current "patient portals."

**Provide Access**: When a patient possesses all of the necessary information needed to view, download, or transmit their information. This could include providing patients with instructions on how to access their health information, the website address they must visit for online access, a unique and registered username or password, instructions on how to create a login, or any other instructions, tools, or materials that patients need in order to view, download, or transmit their information.

**Appropriate Technical Capabilities**: A technical capability would be appropriate if it protected the electronic health information created or maintained by the CEHRT. All of these capabilities could be part of the CEHRT or outside systems and programs that support the privacy and security of CEHRT.

**View**: The patient (or authorized representative) accessing their health information online.

**Download**: The movement of information from online to physical electronic media.

**Transmission**: This may be any means of electronic transmission according to any transport standard(s) (SMTP, FTP, REST, SOAP, etc.). However, the relocation of physical electronic



media (for example, USB, CD) does not qualify as transmission, although the movement of the information from online to the physical electronic media will be considered a download.

## Reporting Requirements

- DENOMINATOR: The number of unique patients discharged from an eligible hospital or CAH inpatient or emergency department (POS 21 or 23) during the EHR reporting period.
- NUMERATOR: The number of patients in the denominator (or patient authorized representative) who are provided timely access to health information to view online, download and transmit to a third party and to access using an application of their choice that is configured to meet the technical specifications of the API in the eligible hospitals or CAHs CEHRT.
- The EHR reporting period in 2022 for new and returning participants attesting to CMS is any continuous 90-day period within the calendar year.

## Scoring Information

- Total points available for this measure: 40 points.
- 100 total points will be available for the required objectives and measures of the Medicare Promoting Interoperability Program.
- In order to earn a score greater than zero, an eligible hospital or CAH must complete the activities required by the Security Risk Analysis and SAFER Guides[1] measures, submit their complete numerator and denominator or Yes/No data for all required measures, attest to the Actions to limit or restrict the compatibility or interoperability of CEHRT statement, as well as report on the required electronic clinical quality measure data.
- Failure to report at least a "1" in all required measures with a numerator or reporting a "No" for a Yes/No response measure (except for the SAFER Guides measure[2]) will result in a total score of 0 points for the Medicare Promoting Interoperability Program. Such eligible hospitals or CAHs who fail to achieve a minimum total score of 60 points are not considered meaningful users and may undergo a downward payment adjustment.
- *Rounding*: When calculating the performance rates and measure and objective scores, scores will be rounded to the nearest whole number.

## Additional Information

- In 2022, eligible hospitals and CAHs may use technology meeting the existing 2015 Edition certification criteria, the 2015 Edition Cures Update criteria, or a combination of the two in order to meet the CEHRT definition.

---

[1] The SAFER, or Safety Assurance Factors for EHR Resilience, Guides measure was added in the FY 2022 Hospital Inpatient Prospective Payment Systems (IPPS) for Acute Care Hospital and Long-Term Care Hospital (LTCH) Prospective Payment System (PPS) Final Rule but will not affect Medicare Promoting Interoperability Program participants' total scores in 2022.
[2] In 2022, eligible hospitals and CAHs will be required to submit one "yes/no" attestation statement for completing an annual self-assessment using all nine SAFER Guides, but the "yes" or "no" attestation response will not affect participants' total scores.



- To learn more about the 2015 Edition Cures Update and the changes to 2015 Edition certification criteria finalized in the 21st Century Cures Act final rule (85 FR 25642), we encourage hospitals to visit https://www.healthit.gov/curesrule/final-rule-policy/2015-edition-cures-update.
- To check whether a health IT product that has been certified to the 2015 Edition Cures Update criteria, visit the Certified Health IT Product List (CHPL) at https://chpl.healthit.gov/.
- 2015 Edition or 2015 Edition Cures Update functionality must be used as needed for a measure action to count in the numerator during an EHR reporting period. However, in some situations the product may be deployed during the EHR reporting period but pending certification. In such cases, the product must be certified to the 2015 Edition or 2015 Edition Cures Update criteria by the last day of the EHR reporting period.
- For the measure, eligible hospitals and CAHs must offer all four functionalities (view, download, transmit, and access through API) to their patients.
- To implement an API, the eligible hospital or CAH would need to fully enable the API functionality such that any application chosen by a patient would enable the patient to gain access to their individual health information provided the application is configured to meet the technical specifications of the API. Eligible hospitals or CAHs may not prohibit patients from using any application, including third-party applications, which meet the technical specifications of the API, including the security requirements of the API. Eligible hospitals or CAHs are expected to provide patients with detailed instructions on how to authenticate their access through the API and provide the patient with supplemental information on available applications that leverage the API.
- Similar to how eligible hospitals or CAHs support patient access to view, download, transmit capabilities, eligible hospitals or CAHs should continue to have identity verification processes to ensure that a patient using an application, which is leveraging the API, is provided access to their health information.
- Any patient health information must be made available to the patient within 36 hours of its availability to the eligible hospital or CAH.
- Eligible hospitals or CAHs may withhold from online disclosure of any information, either prohibited by federal, state, or local laws, or if such information provided through online means may result in significant harm.
- The patient must be able to access this information on demand, such as through a patient portal or personal health record, or by other online electronic means. We note that while a covered entity may be able to fully satisfy a patient's request for information through view, download, and transmit, the measure does not replace the covered entity's responsibilities to meet the broader requirements under the Health Insurance Portability and Accountability Act (HIPAA) to provide an individual, upon request, with access to public health information in a designated record set.
- Eligible hospitals or CAHs should also be aware that while meaningful use is limited to the capabilities of CEHRT to provide online access, there may be patients who cannot access their EHRs electronically because of a disability. Eligible hospitals or CAHs who are covered by civil rights laws must provide individuals with disabilities equal access to information and appropriate auxiliary aids and services as provided in the applicable statutes and regulations.



- A patient who has multiple encounters during the EHR reporting period, or even in subsequent EHR reporting periods in future years, needs to be provided access for each encounter where they are discharged from the eligible hospital or CAH inpatient or emergency department.
- If a patient elects to "opt out" of participation, that patient must still be included in the denominator.
- If a patient elects to "opt out" of participation, the eligible hospital or CAH may count the patient in the numerator if the patient is provided all of the necessary information to subsequently access their information, obtain access through a patient authorized representative, or otherwise opt back-in without further follow up action required by the eligible hospital or CAH.
- The eligible hospital or CAH must continue to update the information accessible to the patient each time new information is available.
- Actions included in the numerator must occur within the self-selected EHR reporting period.
- For Provide Patients Electronic Access to Their Health Information, the required content is:
  - The Common Clinical Data Set (https://www.healthit.gov/sites/default/files/ccds_reference_document_v1_1.pdf) or USCDI (https://www.healthit.gov/isa/united-states-core-data-interoperability-uscdi).
  - Ambulatory setting only. Provider's name and office contact information.
  - Inpatient setting only. Admission and discharge dates and locations; discharge instructions; and reason(s) for hospitalization.
  - Laboratory test report(s).
  - Diagnostic image report(s).
- For API access the required content is the Common Clinical Data Set (https://www.healthit.gov/sites/default/files/ccds_reference_document_v1_1.pdf) or USCDI (https://www.healthit.gov/isa/united-states-core-data-interoperability-uscdi).

## Regulatory References

- This objective and measure may be found in Title 42 of the Code of Federal Regulations at 42 CFR 495.24 (e)(7)(i). For further discussion, please see 83 FR 41634 through 41677.
- In order to meet this measure, an eligible hospital or CAH must use technology certified to the criteria at 45 CFR 170.315 (e)(1), (g)(7), (g)(8) or (g)(10), and (g)(9).

## Certification Criteria

Below are the corresponding certification criteria for EHR technology that support this measure.

| Certification Criteria |
| --- |
| § 170.315 (e)(1) Patient Engagement - View, Download, and Transmit to 3rd Party |
| § 170.315 (g)(7) Application Access – Patient Selection |
| § 170.315 (g)(8) Application Access – Data Category Request |
| § 170.315 (g)(9) Application Access – All Data Request |
| § 170.315 (g)(10) Application Access – Standardized API for Patient and Population Services |