**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHNATHON MOHR,<br>for himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case 2:23-cv-00731-CFK |
| v. | ) ) ) ) | |
| THE TRUSTEES OF THE UNIVERSITY<br>OF PENNSYLVANIA, | ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA'S
<u>MOTION TO DISMISS FOR FAILURE TO STATE A CAUSE OF ACTION</u>**

**TABLE OF CONTENTS**

**Page**

I.     **FACTUAL ALLEGATIONS AND PROCEDURAL POSTURE** ...............................7

II.    **LEGAL STANDARD** ........................................................................8

III.   **LEGAL ANALYSIS** ..........................................................................9

    A.    **WESCA Prohibits "Interceptions", But Not With All Party Consent**......................9

    B.    **A Recent Third Circuit Decision Reinforced The Consent Exception** ...................10

    C.    **Plaintiff, As An Active Facebook User, Consented To Facebook Tracking**...........11

       1.    Facebook Clearly Disclosed That If Plaintiff Registered For A Facebook Account, He Consented To Facebook's Collection Of His Activity On Other Websites And Apps..........................................................................12

       2.    Plaintiff, By Registering, Consented Via Click-wrap To Facebook's Data Collection ..................................................................................14

       3.    HUP's Privacy Policy Only Reinforced Facebook's Click-Wrap Agreement With Plaintiff ...........................................................................16

       4.    Plaintiff's Consent Destroys His Claim Under WESCA ...........................17

IV.   **CONCLUSION** ................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..................................................................................................8

*Bohus v. Restaurant.com, Inc.,*
  784 F.3d 918 (3d Cir. 2015)....................................................................................8

*In re Burlington Coat Factory Sec. Litig.,*
  114 F.3d 1410 (3d Cir. 1997)..................................................................................8

*Cmmw. v. Byrd,*
  235 A.3d 311 (Pa. 2020)...................................................................................10, 11

*Commonwealth v. Adams,*
  362 Pa. Super. 549 (1987)......................................................................................17

*Commonwealth v. Diego,*
  119 A.3d 370 (Pa. Super. 2015).............................................................................10

*Dolin v. Facebook, Inc.,*
  289 F. Supp. 3d 1153 (D. Haw. 2018)...................................................................12

*Feldman v. Google, Inc.,*
  513 F. Supp. 2d 229 (E.D. Pa. 2007).....................................................................15

*Franklin v. Facebook, Inc.,*
  No. 15-655, 2015 WL 7755670 (N.D. Ga. Nov. 24, 2015)....................................12

*Fteja v. Facebook, Inc.,*
  841 F. Supp. 2d 829 (S.D.N.Y. 2012)....................................................................11

*Hayes v. Facebook,*
  No. 18-2333, 2019 WL 8275335 (D. Colo. Mar. 6, 2019).....................................12

*HealthplanCRM, LLC v. AvMed, Inc.,*
  458 F. Supp. 3d 308 (W.D. Pa. 2020)....................................................................15

*Ieradi v. Mylan Labs., Inc.,*
  230 F.3d 594 (3d Cir.2000).....................................................................................9

*Kidstar v. Facebook, Inc.,*
  2:18-CV-13558, 2020 WL 4382279 (D.N.J. July 31, 2020)..................................12

3

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
    560 F.3d 156 (3d Cir. 2009)..................................................................................14

*Loomer v. Facebook, Inc.*,
    No. 19-80893, 2020 WL 2926357 (S.D. Fla. Apr. 13, 2020)...................................12

*Loveland v. Facebook*,
    20-CV-6260-JMY, 2021 WL 1734800 (E.D. Pa. May 3, 2021) ..............................11

*Lupian v. Joseph Cory Holdings LLC*,
    905 F.3d 127 (3d Cir. 2018)....................................................................................8

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005)....................................................................................9

*Miller v. Facebook, Inc.*,
    No. 09-2810, 2010 WL 9525523 (N.D. Ga. Jan. 15, 2010)......................................12

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016)...................................................................................15

*Opperman v. Path, Inc.*,
    84 F. Supp. 3d 962 (N.D. Cal. 2015) .......................................................................9

*Popa v. Harriet Carter Gifts, Inc.*,
    52 F.4th 121 (3d Cir. 2022) ..............................................................................10, 11

*In re Shop-Vac Mktg. and Sales Practices Litig.*,
    964 F. Supp. 2d 355 (M.D. Pa. 2013) ......................................................................9

*Simeone v. Simeone*,
    525 Pa. 392, 581 A.2d 162 (Pa. 1990)....................................................................15

*Smith v. Facebook, Inc.*,
    745 Fed. Appx. 8 (9th Cir. 2018)...........................................................................12

*Spizzirri v. Zyla Life Scis.*,
    802 F. App'x 738 (3d Cir. 2020) .............................................................................9

*Thomas v. Facebook, Inc.*,
    No. 18-856, 2018 WL 3915585 (E.D. Cal. Aug. 15, 2018)......................................12

*Vasko v. Twyford*,
    2016 WL 3522038 (W.D. Pa. 2016).........................................................................9

*Williams v. Zhou*,
    No. 14-5544, 2019 U.S. Dist. LEXIS 51961 (D.N.J. 2019) ......................................9

4

*In re Yahoo Mail Litig.*,
    7 F. Supp. 3d 1016 (N.D. Cal. 2014) ..............................................................................9

*Zabokritsky v. JetSmarter, Inc.*,
    19-273, 2019 WL 2563738 (E.D. Pa. June 20, 2019)............................................15

**Statutes**

18 Pa. Cons. Stat. Ann. § 5703(1).......................................................................................10

18 Pa. Cons. Stat. Ann. § 5704(4).............................................................................10, 11, 17

28 U.S.C. §§ 1441, 1442, and 1446.......................................................................................7

Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. § 5701,
    *et seq.* ............................................................................................................................6

**Other Authorities**

Rule 12(b)(6)..............................................................................................................8, 9, 18

The Trustees of the University of Pennsylvania, as owner and operator of the Hospital of the University of Pennsylvania ("HUP" as part of "Penn Medicine") move to dismiss this action under Federal Rule of Civil Procedure ("Rule") 12(b)(6) for failure to state a cause of action.[1]  In his Complaint, Plaintiff Johnathon Mohr attempts to abuse a quasi-criminal wiretapping statute, the Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. § 5701, *et seq.* ("WESCA"), to manufacture a class action against a non-profit hospital serving the Philadelphia community.  Plaintiff is wrong on the law and wrong on the facts throughout his Complaint.  In reality, HUP has complied with all legal requirements, and has often gone above and beyond any legal requirement.  However, consistent with the early procedural posture of this case, this Motion focuses on one central and dispositive issue capable of resolution on an initial motion: consent.[2]

Per his own allegations, Plaintiff is an active Facebook user, having created and maintained an account on Facebook since 2020.  As he acknowledges, Facebook is a free service almost entirely funded by online tracking and advertising.  Plaintiff agreed to that tracking by creating an account in 2020, which per public documents required a click-wrap agreement with Facebook.  That click-wrap agreement disclosed in extensive detail Facebook's use of cookies and pixels to collect user activity on third party webpages and apps.   Plaintiff then chose to use pennmedicine.org, a website which has the Facebook logo on the footer of the front page and the vast majority of linked pages.  Pennmedicine.org, since 2018,[3] well before Plaintiff alleges he first used the site, has also had a robust privacy statement that discloses in detail everything that

---

[1] Counsel for HUP met and conferred with counsel for Plaintiff prior to filing this Motion.
[2] HUP reserves all other defenses, including federal defenses, to be raised at the appropriate time.
[3]  Plaintiff alleges he started using pennmedicine.org in 2020.  Therefore, this Motion focuses on the disclosures that existed from the very first time that he could have used the website, consistent with these allegations.  In fact, since 2020, pennmedicine.org has only made its disclosures more detailed, included a standalone Cookie Policy, and added a cookie banner.  Because these features did not exist from the first time Plaintiff alleges he used the website, HUP does not rely on them in this motion.

Plaintiff now claims was hidden from him.  Plaintiff's consent is fatal to his baseless attempt at a multi-million dollar lawsuit.

## I.      FACTUAL ALLEGATIONS AND PROCEDURAL POSTURE

On January 23, 2023, Plaintiff filed this putative class action.  On February 24, 2023, HUP removed this action to federal court pursuant to 28 U.S.C. §§ 1441, 1442, and 1446.  In the Complaint, Plaintiff alleges that he "has an active Facebook account"[4] which he accesses from "multiple devices, including his tablet, smartphone and desktop computer."  *Complaint*, ¶8. Plaintiff notes that "when creating an account," on Facebook, "users must provide their first and last name, along with their birthday and gender." *Complaint*, ¶22.  As Plaintiff notes and extensively documents in his own extensive Complaint, Facebook makes almost all of its revenue from tracking and advertising to its users.  *Complaint*, ¶23.

Plaintiff separately alleges that, while maintaining his Facebook account, he "used the pennmedicine.org website and patient portal to schedule an appointment and access medical results."  *Complaint*, ¶7.  While the Complaint identifies three web addresses—pennmedicine.org, pennbehavioralhealth.org,[5] and/or uphs.upenn.edu[6] as well as the myPennMedicine app—Plaintiff does not allege that he personally used pennbehavioralhealth.org, uphs.upenn.edu or the App.

The Complaint alleges that HUP "aids[*sic*] employs, agrees, and conspires with Facebook/Meta to intercept communications sent and received by Plaintiff and Class Members". *Complaint*, ¶ 2.  The Complaint alleges that by using Facebook pixels and cookies in connection with the websites and the App, HUP caused disclosures to Facebook that violated WESCA.

---

[4] The Complaint consistently identified Meta, Inc. by its prior name, "Facebook".  This Motion will follow Plaintiff's convention and simply call the third party Facebook.
[5] Pennbehavioralhealth.org redirects to www.med.upenn.edu/PennMedicineEAP/, which is Penn Medicine EAP (formerly known as Penn Medicine Princeton EAP and Penn Behavioral Health Corporate Services).  This is an employee assistance program.  Plaintiff does not allege he is a Penn Medicine employee.
[6] uphs.upenn.edu redirects to pennmedicine.org.

*Complaint*, ¶¶ 2 and 12.  The Complaint seeks eleven forms of relief against HUP, including declaratory relief, compensatory damages, statutory damages, punitive damages, disgorgement, prejudgment interest, attorney's fees, expenses of cost and suit, and injunctive relief.  *Complaint*, pp. 22-23, Prayer for Relief.

## II.   **LEGAL STANDARD**

To defeat a Rule 12(b)(6) motion to dismiss, the complaint must contain "more than threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citation omitted).  The facts alleged, if true, must give rise to "more than a sheer possibility that a defendant has acted unlawfully". *Id*. at 678. "Determining whether a complaint states a plausible claim for relief will…be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

On a Motion to Dismiss, the Court may consider the factual allegations made, as well as any "document integral to or explicitly relied upon in the complaint". *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  "To prevail on a Rule 12(b)(6) motion to dismiss based on an affirmative defense… a defendant must show that 'the defense is apparent on the face of the complaint' and documents relied on in the complaint." *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 130 (3d Cir. 2018) (quoting *Bohus v. Restaurant.com, Inc.*, 784 F.3d 918, 923 n.2 (3d Cir. 2015).  In this case, those documents include:

- The pennmedicine.org website and its contents, *Complaint*, ¶ 2, 37, 38, 39; and
- The Facebook website at and its contents, *Complaint*, ¶ 22, n. 4.

Further, in deciding a Motion to Dismiss, the Court may consider matters subject to judicial notice, including language contained on websites that are freely available to the general public. *See, e.g., Spizzirri v. Zyla Life Scis.*, 802 F. App'x 738, 739 (3d Cir. 2020) (affirming dismissal

based on government report available to the public via the web). *See also In re Shop-Vac Mktg. and Sales Practices Litig.*, 964 F. Supp. 2d 355, 358, n.1 (M.D. Pa. 2013) (taking judicial notice of defendant's commercial website). *Accord, In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 264 n.3 (3d Cir. 2005) (finding courts can consider facts "even on a motion to dismiss" where those "facts are not subject to reasonable dispute [and are] capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned") (citing *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 600 n. 3 (3d Cir.2000) (internal quotations omitted). Courts have thus taken judicial notice of both publicly-available webpages and archived copies of those same webpages. *See*, *e.g., Williams v. Zhou*, No. 14-5544, 2019 U.S. Dist. LEXIS 51961, at *9 n.9 (D.N.J. 2019) (taking judicial notice of the Government of Antigua and Barbuda webpage as well as its copy on the Internet Archive's Wayback Machine).

Here, the issue of whether Plaintiff consented to the alleged interception of his communications may be resolved on a Rule 12 motion, as the Complaint includes facts which, if true, preclude Plaintiff's own claim. *See Vasko v. Twyford*, 2016 WL 3522038 at *5 (W.D. Pa. 2016) (finding plaintiff failed to state a plausible claim for relief under the federal Wiretap Act because she pled facts to indicate consent). *See also In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016 (N.D. Cal. 2014) (finding users consented to defendant's practices and granting defendant's Rule 12 motion for failure to state a claim under the federal Wiretap Act); *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 992 (N.D. Cal. 2015) (undertaking Rule 12(b)(6) analysis to find plaintiffs did not consent to website data collection).

## III.    LEGAL ANALYSIS

### A.    WESCA Prohibits "Interceptions", But Not With All Party Consent

Per WESCA, "Except as otherwise provided in this chapter, a person is guilty of a felony of the third degree if he: (1) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication[.]" 18 Pa. Cons. Stat. Ann. § 5703(1). Plaintiff claims that HUP "procured" Facebook to intercept his communications in violation of the Act. *See Complaint*, ¶81.

However, "[i]t shall not be unlawful and no prior court approval shall be required under this chapter for: …A person, to intercept a wire, electronic or oral communication, where all parties to the communication have given prior consent to such interception". 18 Pa. Cons. Stat. Ann. § 5704(4). Under this mutual consent exception, "prior consent can be demonstrated when the person being recorded knew or should have known, that the conversation was being recorded." *Cmmw. v. Byrd*, 235 A.3d 311, 94 (Pa. 2020) (citing *Commonwealth v. Diego*, 119 A.3d 370, 377 (Pa. Super. 2015). Actual knowledge is not required to demonstrate consent under the Act. *Id*. (noting "the phrase 'actual knowledge' does not appear in the statutory language of the mutual consent exception").

**B.      A Recent Third Circuit Decision Reinforced The Consent Exception**

The Third Circuit Court of Appeals recently had occasion to interpret WESCA. *See Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121 (3d Cir. 2022) (hereafter, "*Harriet Carter*"). In *Harriet Carter*, plaintiff Ashley Popa "browsed the website of Harriet Carter Gifts, added a set of stairs to her cart, but then left the website without making a purchase. But she later discovered that, unbeknownst to her as she was browsing the website, a third-party marketing service Harriet Carter was using, NaviStone, tracked her activities across the site". *Id*. at 124. Popa brought a class action against Harriet Carter and Navistone under WESCA. The District Court granted summary judgment for NaviStone and Harriet Carter. "It held NaviStone could not have 'intercepted'

10

Popa's communications because it was a 'party' to the electronic conversation. Alternatively, it ruled that if any interception did occur, it happened outside Pennsylvania's borders; thus the Act did not apply." *Id.* The Third Circuit read Pennsylvania's law differently on both counts, and thus vacated the grant of summary judgment and remanded the case.

Without admission of any fact, HUP is not basing this Motion on an argument that there has been no interception within the meaning of the statute. Therefore, this Motion will not address that section of the Third Circuit's ruling at any length. Instead, we note the Third Circuit's treatment of another key argument, consent. As to consent, the Third Circuit noted as follows in connection with remand:

> The Defendants argue Popa impliedly consented to the interception because Harriet Carter included a privacy policy on the website when she visited. Though Popa claims she never saw the policy, the Pennsylvania Supreme Court has said that "prior consent" in § 5704(4) does not require "actual knowledge." *Commonwealth v. Byrd*, 235 A.3d 311, 319 (Pa. 2020). Prior consent, including implied consent, "can be demonstrated when the person being recorded knew or should have known[] that the conversation was being recorded." *Id.* (internal quotation marks omitted).

*Harriet Carter*, 52 F.4th at 121, 132. The Third Circuit remanded to the trial court, including to make a determination as to consent, which the trial court had not done.

### C.   Plaintiff, As An Active Facebook User, Consented To Facebook Tracking

The all-party consent exception of WESCA applies because Plaintiff knew or should have known of the alleged disclosures to Facebook. Many courts, including this one, have held that Facebook's website terms are enforceable because Facebook users are provided with notice sufficient to constitute assent to the terms. *See Loveland v. Facebook*, 20-CV-6260-JMY, 2021 WL 1734800 at *2, n.1 (E.D. Pa. May 3, 2021) (enforcing forum selection clause within Terms of Service and noting Facebook's registration process requires users to acknowledge that they agreed to the Terms); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 840 (S.D.N.Y. 2012) (finding plaintiff

Facebook users consented to Facebook's Terms of Use because terms were "reasonably communicated" by requiring users to click on "sign up" button to assent); *Smith v. Facebook, Inc.*, 745 Fed. Appx. 8, 8-9 (9th Cir. 2018) (affirming district court's finding that plaintiffs had consented to Facebook's data tracking and collection practices outlined in Terms and Policies); *Kidstar v. Facebook, Inc.*, 2:18-CV-13558, 2020 WL 4382279 at *4 (D.N.J. July 31, 2020) ("Numerous courts have affirmed the validity and enforceability of Facebook's terms of use") (citing cases); *Loomer v. Facebook, Inc.*, No. 19-80893, 2020 WL 2926357, at *3 (S.D. Fla. Apr. 13, 2020); *Hayes v. Facebook*, No. 18-2333, 2019 WL 8275335, at *3 (D. Colo. Mar. 6, 2019); *Thomas v. Facebook, Inc.*, No. 18-856, 2018 WL 3915585, at *4 (E.D. Cal. Aug. 15, 2018); *Dolin v. Facebook, Inc.*, 289 F. Supp. 3d 1153, 1160 (D. Haw. 2018); *Franklin v. Facebook, Inc.,* No. 15-655, 2015 WL 7755670, at *2 (N.D. Ga. Nov. 24, 2015); Miller v. *Facebook, Inc.*, No. 09-2810, 2010 WL 9525523, at *1 (N.D. Ga. Jan. 15, 2010).

      1.     <u>Facebook Clearly Disclosed That If Plaintiff Registered For A Facebook Account, He Consented To Facebook's Collection Of His Activity On Other Websites And Apps</u>

Plaintiff alleges that he has maintained a Facebook account since 2020. *Complaint*, ¶8. Available at the link cited below[7] and attached as Exhibit A to the Declaration of Paul Bond, Esq. ("Bond Declaration") is the sign-up page for Facebook as it existed on January 1, 2020. Immediately above the "**Register**" button is a disclaimer that says "By clicking on 'Sign up', you accept our Conditions, the Data Policy and the Cookies Policy. We may send you SMS notifications, which you can turn off at any time." The words and phrases "Conditions," "Data Policy," and "Cookies Policy" are all highlighted in the text and hyperlinked to other documents.

---

[7] https://web.archive.org/web/20200101003905/https://www.facebook.com/

This is a classic click-wrap agreement, which per his own Complaint, Plaintiff accepted by establishing an account.

The link to the Conditions, which Plaintiff agreed to by registering, goes to Facebook's Terms of Service.  Available at the link cited below[8] and attached as Exhibit B to the Bond Declaration is the Terms of Service page for Facebook as it existed on January 1, 2020.  The Terms of Service plainly spell out how Facebook provides a free service—by collecting personal information to show targeted ads:

> We don't charge you to use Facebook or the other products and services covered by these Terms. Instead, businesses and organizations pay us to show you ads for their products and services. By using our Products, you agree that we can show you ads that we think will be relevant to you and your interests. We use your personal data to help determine which ads to show you.

The Data Policy link, which Plaintiff agreed to by registering, goes to Facebook's Data Policy.  Available at the link cited below[9] and attached as Exhibit C to the Bond Declaration  is the Data Policy page for Facebook as it existed on January 1, 2020.  The Data Policy expressly says that Facebook collects "Information from Partners":

> *Advertisers, app developers, and publishers can send us information through Facebook Business Tools they use, including* our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or *the Facebook pixel*. *These partners provide information about your activities off Facebook*—including information about your device, *websites you visit*, purchases you make, the ads you see, and *how you use their services*—whether or not you have a Facebook account or are logged into Facebook. For example, a game developer could use our API to

---

[8] https://web.archive.org/web/20200101163238/https://www.facebook.com/legal/terms/update
[9] https://web.archive.org/web/20200101005216/https://www.facebook.com/about/privacy/update/

tell us what games you play, or a business could tell us about a purchase you made in its store.

(emphasis added).

The Cookies Policy link, which Plaintiff agreed to by registering, goes to a Facebook document called Cookies & Other Storage Technologies. Available at the link cited below[10] and attached as Exhibit D to the Bond Declaration is the Cookies & Other Storage Technologies page for Facebook as it existed on January 2, 2020. Here Facebook disclosed:

> We use cookies if you have a Facebook account, use the Facebook Products, including our website and apps, or visit other websites and apps that use the Facebook Products (including the Like button or other Facebook Technologies). Cookies enable Facebook to offer the Facebook Products to you and to understand the information we receive about you, including information about your use of other websites and apps, whether or not you are registered or logged in.

In the same document, in response to the question, "Where do we use cookies?", Facebook answered:

> We may place cookies on your computer or device, and receive information stored in cookies, when you use or visit…
>
> Websites and apps provided by other companies that use the Facebook Products, including companies that incorporate the Facebook Technologies into their websites and apps. Facebook uses cookies and receives information when you visit those sites and apps, including device information and information about your activity, without any further action from you. This occurs whether or not you have a Facebook account or are logged in.

2.      Plaintiff, By Registering, Consented Via Click-wrap To Facebook's Data Collection

Contract formation requires: (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration. *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (citation omitted). "Contracting parties are

---

[10] https://web.archive.org/web/20200102000316/https://www.facebook.com/policies/cookies/

normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied [are] reasonable or good bargains." *Simeone v. Simeone*, 525 Pa. 392, 581 A.2d 162, 165 (Pa. 1990). A click-wrap agreement is just one form of agreement, commonly upheld. "A clickwrap agreement appears on an internet webpage and requires that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction." *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007). "[A]n internet user need not actually read the terms and conditions or click on a hyperlink that makes them available as long as she has notice of their existence." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 232 (2d Cir. 2016). "Whether the user actually reads the terms to which she assents is immaterial." *Zabokritsky v. JetSmarter, Inc.*, 19-273, 2019 WL 2563738, at *3 (E.D. Pa. June 20, 2019). "And clickwrap agreements are routinely enforced by the courts." *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 331 (W.D. Pa. 2020).

In exchange for this free service, Plaintiff therefore consented to, *inter alia*:

- Facebook collecting his personal data;

- Facebook using that personal data to sell ads;

- Facebook's collection of data using Facebook cookies, the Facebook pixel and other Facebook Business Tools, including on third party websites and apps; and

- Collection of data about his use of, and transactions on, those other websites and apps.

Plaintiff, in short, consented by contract to exactly the sort of data collection that he now seeks to turn into a class action against HUP.

15

      3.       <u>HUP's Privacy Policy Only Reinforced Facebook's Click-Wrap Agreement With Plaintiff</u>

Plaintiff's click-wrap agreement with Facebook is fatal to his case.  But a look at pennmedicine.org further demonstrates the implausibility of his claim to be shocked that Facebook was on the page.  Plaintiff alleges that he has used the pennmedicine.org website since 2020. *Complaint*, ¶7.  Available at the link cited below[11] and attached as Exhibit E to the Bond Declaration  is the pennmedicine.org front page as it existed on January 8, 2020. The front page of the pennmedicine.org website had the following footer:



This footer prominently displayed the Facebook logo.

Further, by clicking on "HIPAA and Privacy", and then on the "Privacy Statement:  Penn Medicine's commitment to your privacy and online privacy principles," the user could see the Penn Medicine Privacy Statement.   Available at the link cited below[12] and attached as Exhibit F to the Bond Declaration is the Penn Medicine Privacy Statement as it existed on December 6, 2019.   The Privacy Statement listed **Personal Information** collected including "Social media account ID".  Under **Collection of Personal Information**, it said "We and our third party service providers collect Personal Information in a variety of ways," including through the Services (defined to include websites and apps).  Under **Disclosure of Information**, the Privacy Statement says "We may disclose Personal Information" including "[t]o our third party services providers to

---

[11] https://web.archive.org/web/20200108223947/https://www.pennmedicine.org/
[12] https://web.archive.org/web/20191206030157/https://www.pennmedicine.org/for-patients-and-visitors/patient-information/hipaa-and-privacy/privacy-statement

facilitate services they provide to us" and "[t]o third parties to permit them to send you promotional

communications, consistent with your choices."

The Privacy Statement specifically, and at length, described the use of cookies and pixel

tags by HUP and its third party partners, under **Collection of Other Information**.  As to cookies,

the Privacy Statement noted:

> Cookies are pieces of information stored directly on the computer that you are
> using. Cookies allow us to collect information such as browser type, time spent on
> the Services, pages visited, language preferences, and other traffic data. We and our
> third party service providers use the information for security purposes, to facilitate
> navigation, to display information more effectively, and to personalize your
> experience. We also gather statistical information about use of the Services in order
> to continually improve their design and functionality, understand how they are used
> and assist us with resolving questions regarding them. Cookies further allow us to
> select which of our programs, initiatives, offerings and services are most likely to
> appeal to you and display them while you are on the Services. We may also use
> cookies or other technologies in online advertising to track responses to our ads.

As to pixels, the Privacy Statement noted:

> **Pixel tags**. Pixel Tags (also known as web beacons or clear GIFs) may be used to,
> among other things, track the actions of users of the Services (including email
> recipients), measure the success of our marketing campaigns, and compile statistics
> about usage of the Services and response rates.

4.      Plaintiff's Consent Destroys His Claim Under WESCA

Again, "[i]t shall not be unlawful and no prior court approval shall be required under this

chapter for: …A person, to intercept a wire, electronic or oral communication, where all parties to

the communication have given prior consent to such interception".  18 Pa. Cons. Stat. Ann. §

5704(4).  Plaintiff consented to Facebook tracking him, including using cookies and pixels,

including on third party websites and apps, when he hit the **Register** button in 2020.  That consent

endures over the passage of time, while he has his Facebook account, without the need for every

website and app that he uses reminding him again and again.  *See, e.g.*, *Commonwealth v. Adams*,

362 Pa. Super. 549, 555 (1987) ("there is no statutory requirement that consent be authorized prior

17

to every conversation nor does [WESCA] set forth a specific length of time during which a consent remains viable"). Yet, over and above any obligation, pennmedicine.org and the overwhelming majority of linked pages had the Facebook logo on the front page and had a long and detailed Privacy Statement talking about how it and its third party partners used cookies and pixels to collect Social Media IDs and browsing history.

## IV.    CONCLUSION

For all of the above reasons, HUP moves to dismiss this action under Rule 12(b)(6) for failure to state a cause of action.

Dated: March 23, 2023                          Respectfully submitted,

                                               */s/ Mark S. Melodia*_____
                                               Mark S. Melodia (I.D. No. 53515)
                                               HOLLAND & KNIGHT LLP
                                               31 W. 52nd Street, 12th Floor
                                               New York, NY 10019
                                               (212) 513-3583
                                               Mark.Melodia@hklaw.com

                                               Paul Bond (admitted pro hac vice)
                                               HOLLAND & KNIGHT LLP
                                               Cira Centre, Suite 800
                                               2929 Arch Street
                                               Philadelphia, PA 19104
                                               (215) 252-9535
                                               Paul.Bond@hklaw.com

                                               *Counsel for Defendant Trustees of the*
                                               *University of Pennsylvania*