IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JONATHAN MOHR,** | : | **CIVIL ACTION** |
| *for himself and others similarly situated,* | : | |
| *Plaintiffs,* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THE TRUSTEES OF THE UNIVERSITY OF** | : | |
| **PENNSYLVANIA,** | : | |
| *Defendant.* | : | **NO.  23-cv-731** |

## MEMORANDUM

**KENNEY, J.**                                                          **April 20, 2023**

### I.       INTRODUCTION

Jonathan Mohr ("Plaintiff"), on behalf of himself and others similarly situated, asserts one claim under the Pennsylvania Wiretapping Act, 18 Pa. Const. Stat. § 5701, *et seq.*, against The Trustees of the University of Pennsylvania ("Defendant"), which operates, controls, and manages the Hospital of the University of Pennsylvania Health System ("Penn Medicine"). ECF No. 1, Ex. 1A. Presently before the Court is Plaintiff's Motion to Remand, to which Defendant objects. ECF Nos. 13, 15.

### II.      BACKGROUND AND PROCEDURAL HISTORY

Plaintiff initiated this action in the Court of Common Pleas of Philadelphia County on January 23, 2023. ECF No. 1, Ex. 1A. In his Complaint, Plaintiff alleges that he used Defendant's online patient portal to schedule appointments and access medical results from 2020 to 2022. *Id.* ¶ 7. According to Plaintiff, Defendant utilizes Facebook's embedded code, "Facebook Tracking Pixel," which duplicates the communication with Penn Medicine's website, and transmits personal

medical information to Facebook's servers without the user's knowledge or consent. *Id.* ¶ 29. Facebook then allegedly uses this information for targeted advertisement purposes. *Id* ¶ 30.

In 2009, Congress codified the Health Information Technology for Economic and Clinical Health Act ("HITECH Act") which created the Office of the National Coordinator for Health Information Technology and appropriated a multi-billion-dollar budget in part for "[h]ealth information technology architecture that will support the nationwide electronic exchange and use of health information in a secure, private, and accurate manner." ECF No. 1 ¶ 24. The Meaningful Use Program incorporated in the HITECH Act allowed eligible healthcare providers to receive incentive payments from the United States Department of Health and Human Services ("DHHS") if the providers demonstrated "meaningful use" of Electronic Health Records ("EHR"). *Id.* ¶ 25. In turn, the Center for Medicare & Medicaid Services ("CMS") was tasked with administering the incentive payments and evaluating whether eligible providers met the requisite benchmarks. *Id.* ¶¶ 28, 31–35. To that end, Defendant asserts that the online patient portals were established and developed to adhere to the Meaningful Use Program. *See id.* ¶ 8. Accordingly, Defendant has received incentive payments under the Meaningful Use Program since 2011. *Id.* ¶¶ 29–30. Defendant does not dispute the use of Facebook pixels or cookies but asserts that the use of such tracking technologies is pivotal to understanding the path users of Penn Medicine's consumer-facing website take to navigate to the patient portal. *Id.* ¶ 41. According to Defendant, such information allows for any necessary changes to remove obstacles to the users' navigation path which, in turn, expands the use of EHRs in furtherance of CMS objectives. *Id.* ¶¶ 41, 44.

Defendant timely removed this case pursuant to 28 U.S.C. § 1442(a)(1) on February 24, 2023. ECF No. 1. Defendant asserts that this case is properly in federal court because Defendant was acting under the United States vis-à-vis DHHS and CMS to fulfill the federal policy of

promoting wider availability of EHR. ECF No. 1 at 4–13. Plaintiff filed a Motion to Remand on March 27, 2023, to which Defendant Replied on April 10, 2023. ECF Nos. 13, 15. The motion is now ripe for consideration.

### III.   DISCUSSION

A defendant may remove a lawsuit to federal court when certain jurisdictional criteria are met. 28 U.S.C. §§ 1441–55. A notice of removal "must allege the underlying facts supporting each of the requirements for removal jurisdiction." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Phila.*, 790 F.3d 457, 466 (3d Cir. 2015) (hereinafter *Defender Ass'n*) (internal quotes omitted). Defendant, as the removing party, carries the burden of establishing the Court's jurisdiction. *Samuel-Bassett v. Kia Motors Am., Inc.*, 357 F.3d 392, 396 (3d Cir. 2004). A proper federal officer removal pursuant to 28 U.S.C. § 1442(a)(1), as relied upon by Defendant, requires that: (1) Defendant is a "person" within the meaning of the statute; (2) Plaintiff's claims are based upon Defendant's conduct "acting under" the United States, its agencies, or its officers; (3) Plaintiff's claims against Defendant are "for or relating to" an act under color of federal office; and (4) Defendant raises a colorable federal defense to Plaintiff's claims. *Defender Ass'n*, 790 F.3d at 467. The federal officer removal statute is "broadly construed," yet, it is "not limitless." *Watson v. Philip Morris Cos., Ins.*, 551 U.S. 142, 147 (2007). A motion to remand is analyzed under the same framework as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction and, accordingly, Plaintiff may challenge the removal through either a facial or a factual challenge. *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 811 (3d Cir. 2016). Here, Plaintiff asserts a factual attack which "challenges subject matter jurisdiction without disputing the facts alleged in the [Notice of Removal], and . . . requires the Court to

'consider the allegations of the [Notice of Removal] as true.'" *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).

### a. Whether Defendant was "acting under" the United States, its agencies, or its officers

The first disputed element is whether Defendant was "acting under" the United States in implementing the online patient portal. The history of the statute and Supreme Court precedent interpreting its text are determinative here. As described by the Supreme Court, "the word 'under' must refer to what has been described as a relationship that involves 'acting in a certain capacity, considered in relation to one holding a superior position or office.'" *Watson*, 551 U.S. at 151 (quoting 18 Oxford English Dictionary 948 (2d ed. 1989)). Put differently, "the private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152. However, such definitions are technical. For example, though one who complies with the law—such as taxpayers who submit federal tax forms, airline passengers who obey federal smoking prohibitions, or well-behaved federal prisoners—does, in a sense, help or assist the federal government, more is required to fall within the scope of the statute. *See id.* Indeed, the statutory purpose demands a higher bar.

The first iteration of the federal officer removal statute was enacted at the close of the War of 1812 and was informed by state-court claims filed against federal customs officials charged with enforcing a trade embargo with England. *See id.* at 147. The statute was "obviously an attempt to protect federal officers from interference by hostile state courts." *Id.* (internal quotes omitted). The second iteration was informed by a South Carolina law authorizing the prosecution of federal agents who collected federal tariffs. *Id.* at 148. The statute then permitted "'any officer of the United States, *or other person*' to remove to federal court a lawsuit filed against the officer 'for or on account of any act done under the revenue laws of the United States.'" *Id.* (quoting Act of Mar.

2, 1833, ch. 57, § 3, 4 Stat. 633)). As described in 1833, "where states might prove hostile to federal law, and hence to those who enforce that law, the removal statute would 'give a chance to the [federal] officer to defend himself where the authority of the law was recognized.'" *Id.* (quoting 9 Cong. Deb. 461 (1833)). The statute was modified after the Civil War to permit removal for "any person acting under or by authority of any such officer." *Id.* (quoting Act of July 13, 1866, ch. 184, § 67, 14 Stat 171)). In 1948, Congress revised the statute so that it was no longer limited to the revenue context, yet, at no point from the 1800s to present day has Congress changed the scope of the term "acting under." This phrase still "describe[s] the triggering relationship between a private entity and a federal officer." *Id.* at 149. The statute's "basic purpose" today is, as it has always been, to "protect the Federal Government from the interference with its operations that would ensue were a State able, for example, to arrest and bring to trial in a State court for an alleged offense against the law of the State, officers and agents of the Federal Government acting within the scope of their authority." *Id.* at 150 (internal quotations omitted).

Most scenarios are easily categorized based on the statute's "basic purpose." In some cases, however, removal is appropriate where there is a special relationship between a private person and the federal government. The "classic example" of this scenario is a government contractor performing a contractual service and creating goods for the federal government. *Maglioli v. All. HC Holdings LLC*, 16 F.4th 393, 405 (3d Cir. 2021). In this case, the special relationship is borne out of the private person's contractual obligations to the federal government. Less common, where a private entity is created by federal law, the private entity may invoke the federal officer removal statute. *See Defender Ass'n*, 790 F.3d at 461, 472. In both scenarios, a private entity acts under a federal officer or agency when the government uses the private entity "to achieve an end it would have otherwise used its own agents to complete." *Papp*, 842 F.3d at 813. Conversely, "[m]erely

complying with federal laws and regulations is not 'acting under' a federal officer for the purposes of federal-officer removal." *Maglioli*, 16 F.4th at 404. This makes sense considering the purpose of the federal officer removal statute and because "acting under" requires more than compliance with the law or acquiescence to an order; indeed, the private person must be effectively "giving an order or enforcing the law." *Watson*, 551 U.S. at 152.

According to Defendant, "[s]ince the federal government does not itself hold [] EHRs, it requires the assistance of eligible providers to achieve its objectives of (a) creating patient portals and (b) providing patients instructions on how to access their health information." ECF No. 1. ¶ 9. Further, because the federal government incentivizes providers to assist in these aims, Defendant postures that it is akin to a government contractor which "voluntarily provide[s] services under federal specifications to obtain payment from the government." ECF No. 15 at 10. In support of its position, Defendant relies upon *Doe v. UPMC*, in which the Western District of Pennsylvania reasoned that "[t]he fact that the government offers payment in exchange for UPMC's voluntary participation in implementing a nationwide EHR network shows the relationship between UPMC and DHHS is less like the regulator-regulated relationship . . . and more like the government contractor relationship" and remand was inappropriate where "Plaintiffs' allegations are directed at this relationship." 20-cv-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020). The Court is not bound by this well-reasoned opinion nor the other well-reasoned District Court opinions that disagree with *UPMC*.[1] It must conduct its own analysis.

---

[1] On Plaintiff's part, he relies on three out-of-circuit decisions that disagree with *UPMC*. *Doe, I v. BJC Health Sys.*, No. 22-cv-919, 2023 WL 369427, at *4 (E.D. Mo. Jan. 10, 2023); *Quinto v. Regents of Univ. of California*, No, 22-cv-4429, 2023 WL 1448050, at *3 (N.D. Cal. Feb. 1, 2023); *Heard v. Torrance Memorial Medical Center*, 22-cv-9466, 2023 WL 2475544, at *3 (C.D. Cal. Mar. 13, 2023). Though the Court is not bound by these decisions, the analysis of each proves instructive.

In *Papp*, the Third Circuit held that Boeing's predecessor, which produced aircrafts for the United States Navy and Air Force, was the "archetypal case" of an entity "acting under" a federal officer. 842 F.3d at 813. Crucially, in *Papp*, the private entity was in a contractual relationship with the United States to produce an item for the government under its direction and supervision. *Id.* Conversely, here, Defendant voluntarily elected to participate in the EHR incentive program and to meet CMS's benchmarks, but it was in no way obligated to do so. Mere payment, via financial incentives, is simply insufficient to equate Defendant's voluntary status to that of a government contractor. Simply, the "special relationship" between government contractors and the federal government does not exist in the absence of a contract. Moreover, though Defendant carries the burden to establish that federal jurisdiction is appropriate, Defendant does not point to or even attempt to raise any other potential "special relationships." Rather, Defendant appears only to argue that the incentive program is sufficiently like a contract such that Defendant was acting under the United States. Yet something "like a contract" cannot bootstrap a party into the major leap of *having* a legitimate contractual relationship that qualifies as a special relationship for this purpose. An alternative ruling would reach too far.

In *Defender Association*, the Third Circuit reasoned that because the Federal Community Defender is an entity that was created through the Criminal Justice Act, its attorneys were "acting under" the United States when they represented state prisoners. 790 F.3d at 461, 472. This case is easily distinguishable, however, because Defendant was not created by statute nor is its core function governed by federal law like the Federal Community Defender. *See id.* at 469 ("The Federal Community Defender is a non-profit entity created through the [Act]" and its "stated purpose must include implementation of the aims and purposes of [the Act]."). Instead, Defendant is a private entity that voluntarily participates in a federal incentive program and the conduct at

issue is at most tangentially related to its participation in this program. This was not the case in *Defender Association* where the conduct at issue related to "whether [defendant] sufficiently complies with its [federal] *obligations*." *Id.* at 470 (emphasis added). Again, the special relationship borne out of a statutorily created entity is not present here.

Though complying with CMS's priorities is financially beneficial to Defendant, financial incentives alone do not create an unusually close relationship that involves "subjection, guidance, or control." *See Watson*, 551 U.S. at 151. Indeed, like in *Watson* and *Maglioli*, the federal authority relied upon by Defendant "contain[s] verbiage denoting guidance, not control." *Maglioli*, 16 F.4th at 405 (citing *Watson*, 551 U.S. at 153). CMS may thoroughly describe and fund its EHR goals, develop directives and guidelines, and define the governmental policies it is promoting. However, such directives do not, without more, bootstrap private persons who *choose* to adhere to non-binding directives for financial gain into the category of persons "acting under" the United States.

In *Watson*, the Supreme Court declined to extend the federal officer removal statute to private entities in highly regulated industries such as the tobacco industry. Here, CMS's incentive mechanism, based on agency directives rather than statutes or regulations, falls far short of the laws and regulations contemplated in *Watson*. If even "considerable regulatory detail and supervision" does not trigger the federal officer removal statute, neither can CMS's incentive program. *See Watson*, 551 U.S. at 157. To be induced to comply is not enough and to be incentivized to comply is not enough. Defendant's position only holds up if the statute is read out of context from its historical roots and purposes and ignores Supreme Court precedent. Only when untethered and read in the context of common parlance can the statute be read to exponentially expand the reach of the Court's jurisdiction to the federal government's vast funding and incentive programs that significantly influence the conduct of many private entities. *See id.* at 153.

Importantly, this is not a procedural matter regarding the efficient operation of the court and the use of the court's discretion. It goes to the very core of the Court's constitutional powers and is a request to significantly expand those powers based on arguments that seem more grounded upon Webster's Dictionary than the Supreme Court Reporter.[2] Moreover, Plaintiff's Complaint does not in any way seek to interfere with the federal government's operations or the enforcement of federal law. Indeed, it cannot be credibly asserted that Plaintiff's case against Defendant, in which Plaintiff alleges the unlawful dissemination of private medical information, will prevent the enforcement of federal law. Finally, like in *Watson*, Defendant's argument is fatally flawed because "there is no evidence of any delegation of legal authority" from a federal agency to Defendant to undertake actions on the government's behalf. *Id.* at 156.

To summarize, Defendant does not fit into the "basic" scenario contemplated by the statute where a federal official enforces federal law, nor can Defendant be properly categorized as enjoying a "special relationship" with the federal government like that of government contractors or the Federal Community Defenders. Instead, Defendant is simply a private entity that voluntarily elects to engage in a federal incentive program for financial gain. This does not fall within even the broadest interpretation of the federal official removal statute. Because this argument is dispositive, the Court need not consider Plaintiff's second argument as to the causal relationship.

---

[2] The scope of the Court's subject matter jurisdiction must be resolved at this stage. Indeed, if the Court did not remand at this juncture, it is possible that the case might proceed in federal court for several years only to have the Third Circuit determine that subject matter jurisdiction was always lacking. Accordingly, this is a case in which it would be incumbent upon the trial court to *sua sponte* examine the question of jurisdiction had it not been raised by Plaintiff. *See Liberty Mut. Ins. Co. v. Ward Trucking Corp.*, 48 F.3d 742, 750 (3d Cir. 1995) ("[T]he general rule that federal courts have an ever-present obligation to satisfy themselves of their subject matter jurisdiction and to decide the issue *sua sponte* applies equally in removal cases.").

**IV.     CONCLUSION**

For the reasons set forth above, Plaintiff's Motion to Remand (ECF No. 13) will be granted and this case will be remanded to the Court of Common Pleas of Philadelphia County, Pennsylvania.

**BY THE COURT:**


**/s/ Chad F. Kenney**

_____

**CHAD F. KENNEY, JUDGE**